RICHARD E. SIMPSON (RS 5859)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, D.C. 20549-4010
(202) 551-4492

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 0 5 2010 ★

BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| **SECURITIES AND<br>EXCHANGE COMMISSION,** | : | |
| **Plaintiff,** | : | **CV 10 - 2031** |
| | : | |
| **v.** | : | **Civil Action No. _____** |
| | : | |
| | : | **Jury Trial Demanded** |
| **SPONGETECH DELIVERY SYSTEMS, INC.;** | : | |
| **RM ENTERPRISES INTERNATIONAL, INC.;** | : | |
| **STEVEN Y. MOSKOWITZ;** | : | **IRIZARRY, J.** |
| **MICHAEL E. METTER;** | : | |
| **GEORGE SPERANZA;** | : | |
| **JOEL PENSLEY; and** | : | |
| **JACK HALPERIN,** | : | **AZRACK, M.J.** |
| **Defendants.** | : | |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC" or

"Commission"), alleges as follows:

## SUMMARY

1.      This case involves a scheme to increase demand illegally for, and profit

from, the unregistered sale of publicly-traded stock in Defendant Spongetech Delivery

Systems, Inc. ("Spongetech" or the "Company"), a company that sells soap-filled

sponges. Defendants Michael Metter ("Metter"), Steven Moskowitz ("Moskowitz"), and Spongetech accomplished this by, among other things, "pumping" up demand for Spongetech stock through false public statements about non-existent Spongetech customers, bogus sales orders, and phony revenue. The purpose of flooding the market with false public information was to fraudulently inflate the price for Spongetech shares, so Metter, Moskowitz, and Spongetech could then "dump" the shares by illegally selling them to the public through affiliated entities in unregistered transactions.

2. Defendants Metter, Spongetech's Chief Executive Officer and a former registered representative with a long disciplinary history, and Moskowitz, its Chief Operating Officer, control both Spongetech and Defendant RM Enterprises International, Inc. ("RM Enterprises"), Spongetech's majority shareholder. RM Enterprises is one of the conduits through which Metter, Moskowitz, and Spongetech illegally distributed approximately 2.5 billion Spongetech shares at inflated prices.

3. Defendants Metter, Moskowitz, and Spongetech repeatedly and fraudulently exaggerated the demand for pre-soaped sponges by announcing in press releases and public filings that Spongetech had received tens of millions of dollars in orders for Spongetech products from five primary customers: SA Trading, US Asia Distribution Company or US Asia Trading ("US Asia"), Dubai Export Import Company ("Dubai"), Fesco Sales Corp. ("Fesco"), and New Century Media ("New Century"). Defendants Metter, Moskowitz, and Spongetech knowingly, or recklessly, issued materially false or misleading press releases and made materially false or

2

misleading statements in Commission filings when they knew that these customers and their orders did not exist.

4.      Defendant George Speranza ("Speranza"), a self-employed consultant associated with Spongetech, knowingly, or recklessly, participated in the fraud by, among other things, creating internet websites and virtual office space for the fictitious customers with which Spongetech claimed to be doing millions of dollars of business so that actual or prospective shareholders would believe the customers were legitimate.

5.      Defendants Metter, Moskowitz, and Spongetech further advanced and concealed the fraud by causing the creation of false purchase orders, invoices, and bills of lading, purportedly documenting the fictitious orders received from, and sales to, non-existent customers.

6.      Defendants Metter, Moskowitz, and Spongetech illegally distributed approximately 2.5 billion Spongetech shares in unregistered transactions through Defendant RM Enterprises and other affiliates, which acted as conduits for the Defendants to distribute restricted shares in unregistered transactions to the public.

7.      As part of their scheme, Defendants Metter, Moskowitz, Spongetech, and RM Enterprises used false and baseless attorney opinion letters rendered by Defendants Joel Pensley ("Pensley"), who is subject to an anti-fraud injunction and who was the subject of an order pursuant to Rule 102(e) as a result of his role in another scheme to sell securities in unregistered transactions, and by Jack Halperin ("Halperin") to distribute shares of Spongetech to the public.  Defendants Pensley and Halperin knowingly, or recklessly or negligently, made false or misleading statements in their attorney opinion letters to Spongetech's transfer agents who then improperly

removed the restrictive legends from Spongetech shares. This allowed RM Enterprises and other affiliates to distribute the shares illegally in the public market in unregistered transactions. Defendants Metter, Moskowitz, and Spongetech also used false and misleading attorney opinion letters, forged in Pensley's name and in the name of a fictitious lawyer, David Bomart ("Bomart"), which Moskowitz transmitted and caused to be transmitted to Spongetech's transfer agents.

8.     Defendants Metter, Moskowitz, and Spongetech also repeatedly and fraudulently understated the number of Spongetech's outstanding shares in press releases and public filings. These Defendants knew, or were reckless in not knowing, that Spongetech actually had hundreds of millions more outstanding shares than they reported.

9.     Defendants Metter, Moskowitz, and Spongetech spent portions of their illicit profits to advertise with professional sports teams and events to support their claims that Spongetech was prosperous, such as highly visible sponsorship deals with professional teams in Major League Baseball, the National Football League, the National Basketball Association, the National Hockey League, and the United States Tennis Association.

10.    At the direction of Defendants Metter and Moskowitz, Spongetech made false and fraudulent periodic filings with the SEC that contained material misrepresentations about Spongetech's orders, sales, and revenue derived from transactions with the fictitious customers and which understated the number of authorized and outstanding shares issued by Spongetech. Metter and Moskowitz signed and certified each of these filings as true and accurate when they knew, or were

4

reckless in not knowing, that the filings contained materially false and misleading statements.

11.    Spongetech failed to maintain, and Metter and Moskowitz failed to implement, effective internal controls.  They also failed to file certain reports required under Section 13(a) of the Securities Exchange Act of 1934.  Metter and Moskowitz directly or indirectly made millions of dollars in profit from the sale of Spongetech shares that eventually were distributed to the public market.

12.    On October 5, 2009, the Commission suspended the trading of Spongetech securities.  The order stated that there was a lack of current and accurate information concerning the securities of Spongetech because questions had arisen regarding the accuracy of assertions in press releases to investors and in periodic reports filed with the Commission concerning, among other things: (1) the amount of sales and customer orders received by the company; (2) the company's investment agreements; and (3) the company's revenues as reported in its financial statements.  In addition, the order stated that Spongetech had not filed any periodic reports with the Commission since the period ended February 28, 2009.  Since the expiration of the 10 day trading suspension, Spongetech shares have continued to trade on the grey market, in which trading takes place involving securities that are not quoted in any quotation service.  Since that date, Defendants Metter, Moskowitz, and Spongetech have continued to issue materially false and misleading press releases regarding Spongetech.

13.    By engaging in this conduct, all the Defendants violated, and unless restrained and enjoined will continue to violate, the antifraud provisions of the federal securities laws; Defendants Spongetech, Metter, Moskowitz, RM Enterprises, Pensley, and Halperin violated,

and unless restrained and enjoined will continue to violate, the registration provisions of the federal securities laws; and Defendants Spongetech, Metter, and Moskowitz violated, and unless restrained and enjoined will continue to violate, the books and records and internal controls provisions of the federal securities laws. Finally, Defendants Metter and Moskowitz have violated, and unless restrained and enjoined will continue to violate, Section 304 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act") [15 U.S.C. § 7243(a)].

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

15.     The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. The Defendants directly, and indirectly, used the means and instrumentalities of transportation and communication in interstate commerce, or the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business in this Complaint.

16.     Venue is proper because certain of the acts and transactions described herein took place in this District.

## DEFENDANTS

17.     Defendant Spongetech Delivery Systems, Inc. is a Delaware corporation with its principal place of business in New York, New York. At relevant times, Spongetech also had a business address in Long Island City, NY. In or about April

2006, Spongetech registered the resale of shares of its common stock with the SEC. It later filed periodic reports with the SEC under Section 15(d) of the Exchange Act. On or about September 28, 2009, Spongetech filed a registration statement with the Commission under Section 12(g) of the Exchange Act, which became effective on the same date. From 2006 until October 5, 2009, Spongetech's common stock was quoted on the Over-the-Counter Bulletin Board as "SPNG" and then as "SPNGE." On October 5, 2009, the SEC suspended Spongetech trading, after which Spongetech's stock continued to be traded on an unsolicited basis in the grey market. Spongetech is delinquent in its filings with the Commission: the last quarterly report Spongetech filed was its Form 10-Q for the third quarter of fiscal year 2009 (ended February 28, 2009), which it filed on April 20, 2009. As of March 24, 2010, there were 2,999,984,950 shares of Spongetech stock issued and outstanding.

18.     Defendant RM Enterprises International, Inc., is a Delaware corporation with its principal place of business in New York, New York. RM Enterprises is the majority shareholder of Spongetech and is controlled by Metter and Moskowitz. Metter and Moskowitz are the sole officers, serve as directors, and are currently the beneficial owners of two-thirds of RM Enterprises. In various Commission filings made between 2007 and 2009, Spongetech represented that Metter and Moskowitz were control persons of RM Enterprises.

19.     Defendant Steven Y. Moskowitz is Spongetech's Chief Operating Officer, Chief Financial Officer, Chief Accounting Officer, and Secretary, and serves as a member of Spongetech's Board of Directors. Moskowitz is also an officer and director of RM Enterprises. Moskowitz is also an officer, director, or both for a

number of companies, including Flo Weinberg, Inc., Tiburon Capital Group, and SEC reporting companies Vanity Events Holding Company, Inc., Map IV Acquisition, Inc., Map VI Acquisition Inc., and Solar Thin Films, Inc. Moskowitz is believed to reside in Flushing, New York.

20.     Defendant Michael L. Metter is Spongetech's President and Chief Executive Officer. He is also President of RM Enterprises and a member of its Board of Directors. Metter serves as an officer and/or director of, among others, Tiburon Capital Group, Flo Weinberg, Inc., and Business Talk Radio.net. Metter is a former registered representative with an extensive disciplinary history including ten customer complaints, one internal review, and a termination. Metter is believed to reside in Greenwich, Connecticut.

21.     Defendant George Speranza is a self-employed consultant associated with Spongetech who operated the internet stock hype site "nohypenobull.com." Speranza is believed to reside in Brooklyn, New York.

22.     Defendant Joel Pensley is an attorney licensed to practice law in New York. From 1999 through sometime in 2005, Pensley was Spongetech's corporate counsel. Pensley was previously enjoined from future violations of Securities Act Sections 5(a), 5(c), and 17(a), and Exchange Act Section 10(b) and Rule 10b-5 on November 14, 1998, as a result of his role in another scheme to sell securities in unregistered transactions. SEC v. DiMauro, et al., No. 98 Civ. 6349 (LAP) (S.D.N.Y. filed Sept. 9, 1998). Based on the entry of this injunction, on January 7, 1999, the Commission issued an administrative order pursuant to Rule 102(e) denying him the privilege of practicing or appearing before the Commission, with the right to reapply

8

after three years.  In the Matter of Joel Pensley, Rel. No. 34-40890 (January 7, 1999).
Pensley is believed to reside in Norfolk, Connecticut.

23.     Defendant Jack Halperin is an attorney licensed to practice law in New
York.  From June 12, 2009, through approximately September 29, 2009, Halperin was
retained by Spongetech to perform corporate services.  Halperin is believed to reside in
New York, New York.

## RELATED ENTITIES AND INDIVIDUALS

24.     Olde Monmouth Stock Transfer Co., Inc., a stock transfer agent located
in Atlantic Highlands, New Jersey, was Spongetech's transfer agent from 2006 until
June 2009.

25.     Worldwide Stock Transfer Co., LLC, a stock transfer agent located in
Hackensack, New Jersey, has been Spongetech's transfer agent since June 2009 to the
present.

## FACTS

### THE PUMP

### False Press Releases

26.     Prior to in or around 2007, Spongetech had relatively little business.
From Spongetech's inception in 1999 through approximately May 31, 2007, a single
customer comprised the bulk of Spongetech's limited sales.  Spongetech's auditors
issued opinions questioning Spongetech's ability to continue as a going concern during
fiscal years 2002 through 2007.

27.     Beginning in or around April 2007, however, Metter, Moskowitz, and
Spongetech began to paint a more promising, and misleading, picture of Spongetech's

business. From approximately April 2007 through the present, Spongetech, Metter, and Moskowitz issued numerous false and fraudulent press releases touting increasingly larger, yet fictitious, sales orders and revenue.

28.     The fraudulent press releases referenced orders, business, and revenue primarily from five customers that did not exist: SA Trading, US Asia, Dubai, Fesco, and New Century. Each of these customers is a fictitious entity which did not place orders or do business with Spongetech.

29.     Spongetech, Metter, and Moskowitz also issued press releases vastly understating the volume of Spongetech's outstanding shares, and falsely claiming that Spongetech intended to reduce its outstanding shares.

30.     Spongetech, Metter, and Moskowitz made these fraudulent statements to mislead investors into believing that Spongetech was a thriving company with extensive demand for its products. For example:

Representative Press Releases

31.     April 30, 2007, Press Release.  On or about April 30, 2007, Spongetech issued a press release claiming that it had "signed a Letter of Intent (LOI) to sell 1,500,000 Car Wash and Car Wax sponges to exporter, SA Trading Group Corp. * * * an exporter of automotive products to South America." In fact, there was no Letter of Intent from this non-existent customer. The April 30, 2007, press release contained a misleading quote from Moskowitz:

> "Steven Moskowitz, Chief Financial Officer of Spongetech Delivery Systems stated 'This is an exciting time for our company. We look forward to finalizing our agreement with SA Trading Group Corp and beginning our sales and distribution in South America.'"

32.   <u>July 10, 2008, Press Release</u>.  On or about July 10, 2008, Spongetech issued a press release titled "SpongeTech® Delivery Systems, Inc. Receives Initial Order from S A Trading for New Tub and tile Sponge and Floor Sponge for $4,155,075 USD[;] SpongeTech's® New Products will be shipped to South America in January 2009."  In fact, there was no initial order of $4,155,075 of Spongetech products from this non-existent customer.  The July 10, 2008, press release contained a misleading quote from Moskowitz:

> "SpongeTech's® COO, Steven Moskowitz said, 'We are excited about these new products and the initial order from S A Trading.  These sponges will be sold to consumers in supermarkets, drug store chains, and large retailers, such as Wal-Mart South America, as well as for commercial use in hotels and restaurants.'"

33.   <u>August 4, 2008, Press Release</u>.  On or about August 4, 2008, Spongetech issued a press release titled "SpongeTech® Delivery Systems, Inc. Receives Second Re-order in Excess of $4,250,000 Patented Sponge Products from Dubai!!"  The August 4, 2008, press release claimed that "Dubai Export Import Company, in Dubai," had placed a "second re-order" for "210,000 units" and a new order of "10,000 units."  According to the August 4, 2008, press release, orders from "Dubai Export Import Company" amounted to "in excess of $4,250,000," would "be paid in full prior to shipping," and were "expected to ship * * * by December 15, 2008."  In fact, there was no re-order in excess of $4.25 million of Spongetech products from this non-existent customer.  The August 4, 2008, press release contained a misleading quote from Moskowitz:

> "SpongeTech®'s COO, Steven Moskowitz said, 'We are very pleased with the third and biggest order of 210,000 units.  The first in November was 11,000 units, the second was 55,000 units in April, and now this one.  What a show of positive response to our products in Dubai!'"

11

34.    February 3, 2009, Press Release.  On or about February 3, 2009, Spongetech issued a press release claiming that it had "retired another thirty million shares (30,000,000)," leaving Spongetech's "issued and outstanding" shares "at approximately 700,000,000."  The February 3, 2009, press release contained a misleading quote from Metter:

> "SpongeTech® Delivery Systems, Inc., CEO, Michael Metter said, 'Since we began our efforts, we have retired approximately 260 million shares to treasury; decreasing the issued and outstanding by approximately 29%!  This should be a very positive statement to our investors, shareholders, and the public market that we are growing and here to stay.'"

35.    This press release was false.  When that press release was issued, Spongetech had approximately 1.2 billion outstanding shares.  Spongetech, Moskowitz, and Metter knowingly or recklessly understated the number of outstanding shares by more than 500 million shares.

36.    April 15, 2009, Press Release.  On or about April 15, 2009, Spongetech issued a press release that claimed "record sales of over $13,000,000 for the third quarter ending February 28, 2009."  The April 15, 2009, press release claimed that "[f]or the nine-month period ended February 28, 2009, the company reported revenues of about $31,000,000 * * *."  The April 15, 2009, press release contained a misleading quote from Metter:

> "SpongeTech® CEO, Michael Metter said, 'We have just concluded a fantastic third quarter 2009, even though our country has been in a very difficult economic environment, [sic] the company continues to experience significant growth.  The company's success is attributed to strong sales of all of our products utilizing an expanding diverse marketing strategy.  We began making shipments to retail outlets and distributors across the United States and we anticipate finishing off the fiscal year very strong.'"

37.    Spongetech grossly and materially overstated its sales for the quarter and the nine-month period ended February 28, 2009.  Spongetech had no significant customer base when it issued the April 15, 2009, press release, and Metter grossly and materially exaggerated the extent of Spongetech's nationwide distribution.

38.    <u>July 29, 2009, Press Release</u>.  On or about July 29, 2009, Spongetech issued a press release claiming that it was "taking action" to "reduce the number of common shares that the Company has authorized to 900,000,000" and to "lower its outstanding shares to approximately 500,000,000" shares.  The July 29, 2009, press release contained a misleading quote from Metter:

> "'We are excited to be moving quickly to complete the process of reducing both our authorized and outstanding shares as well as provide clarity,' commented Michael Metter, CEO of SpongeTech®.  'This significant reduction is an expression of both the progress that the Company and its innovative product lines have made to date.'"

39.    Metter, Moskowitz, and Spongetech vastly understated the number of Spongetech's outstanding shares to hide the large number of shares in the market place.  As of the July 29, 2009, press release, Spongetech had more than 2.4 <u>billion</u> outstanding shares.  Instead of reducing the number of its outstanding shares, Spongetech issued another 150 million <u>new</u> shares within twelve business days of its July 29, 2009, press release.  Of those newly issued shares, 118 million shares went to RM Enterprises, the entity Metter and Moskowitz controlled.  At the time they issued the press release, Spongetech, Metter, and Moskowitz had no intention of retiring significant amounts of outstanding Spongetech shares.

40.    Between on or about April 2007 and the present, Spongetech, Metter, and Moskowitz issued at least sixteen other Spongetech press releases which contained

13

similar false and misleading statements regarding Spongetech's orders, customers, financial performance, and outstanding shares. These include press releases dated on or about April 30, 2007; June 28, 2007; December 20, 2007; March 4, 2008; April 14, 2008; May 30, 2008; July 30, 2008; October 21, 2008; January 8, 2009; March 31, 2009; June 9, 2009; June 29, 2009; July 16, 2009; July 31, 2009; August 17, 2009; and September 1, 2009.

41.    Moskowitz and Metter reviewed and approved Spongetech press releases. When Moskowitz and Metter approved the press releases, they knew, or were reckless in not knowing, that the press releases contained materially false or misleading statements.

## False and Fraudulent Public Filings

42.    Metter, Moskowitz, and Spongetech further perpetrated the scheme through materially false or misleading statements they made in Spongetech's public Commission filings:

a. FY 2008 10-KSB:  On or about August 29, 2008, Spongetech filed an annual report, on Form 10-KSB, with the SEC, for its fiscal year ended May 31, 2008. Metter, Moskowitz and a member of Spongetech's Audit Committee signed this filing.

b. First Quarter FY 2009 10-Q:  On or about October 15, 2008, Spongetech filed a quarterly report with the SEC reporting on Form 10-Q for the fiscal quarter ended August 31, 2008. Metter and Moskowitz signed this filing.

c. Second Quarter FY 2009 10-Q:  On or about January 14, 2009, Spongetech filed a quarterly report with the SEC on Form 10-Q for the fiscal quarter ended November 30, 2008. Metter and Moskowitz signed this filing.

14

d. <u>Third Quarter FY 2009 10-Q</u>: On or about April 20, 2009,

Spongetech filed a quarterly report with the SEC on Form 10-Q for the fiscal quarter

ended February 28, 2009. Metter and Moskowitz signed this filing.

43.    In connection with each filing, Metter and Moskowitz signed

certifications in which they represented that:

> a.    based on their knowledge, the report "[did] not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;"

> b.    based on their knowledge, "the financial statements and other financial information in this report, fairly present in all material respects the financial condition, result of operations and cash flows of" Spongetech;

> c.    they had each "establish[ed] and maintain[ed] disclosure controls and procedures * * * and internal controls over financial reporting" to, among other things, "ensure that material information provided," and to "provide reasonable assurance regarding the reliability of financial reporting;" and

> d.    they had each disclosed to Spongetech's auditors "all significant deficiencies" in "internal controls" and "any fraud, whether or not material, that involves management,"

44.    Despite those representations, Metter, Moskowitz, and Spongetech

knew, or were reckless in not knowing, that each filing contained materially false and

fraudulent statements. Among other things, the filings referenced sales, agreements,

and orders from SA Trading, US Asia, Dubai Export Import Company, Fesco Sales

Corp., and New Century Media, none of which existed. Metter, Moskowitz, and

Spongetech made these statements to mislead investors into believing that Spongetech

was a thriving company with extensive demand for its products.

45.     FY 2008 10-KSB: For example, Spongetech's 2008 10-KSB represented that "[d]uring the fiscal year ended May 31, 2008, three customers [sic] for an aggregate of approximately 70.5% of our sales. Our three largest customers during the fiscal year ended May 31, 2008 are SA Trading Company, US Asia Trading, and Dubai Export Import Company." It also represented that Spongetech "had sales of $4,633,084 for the fiscal year ended May 31, 2008 as compared to $55,112 for the fiscal year ended May 31, 2007, an increase of $5,577,972." In fact, as Metter, Moskowitz, and Spongetech well knew, or were reckless in not knowing, Spongetech had nowhere near $4.6 million in sales because fictitious customers were responsible for "70.5% of [Spongetech's] sales."

46.     First Quarter FY 2009 10-Q: As another example, Spongetech's Q1 2009 10-Q represented that "[f]or the first quarter ended August 31, 2008, three customers, SA Trading Company, US Asia Trading, and Dubai Export Import Company, accounted for 67.6 percent of our sales." It also represented that Spongetech had exceeded $5.5 million in revenue for the three-month-period ending on August 31, 2008. In fact, as Metter and Moskowitz well knew, or were reckless in not knowing, Spongetech had nowhere near $5.5 million in sales for that period because fictitious customers were responsible for "67.6 percent of [Spongetech's] sales."

47.     Second Quarter FY 2009 10-Q: Similarly, Spongetech's Q2 2009 10-Q represented that "[f]or the six months ended November 30, 2008, three customers, SA Trading Company, Dubai Export Import Company and New Century Media, accounted for 82.9 percent of sales." It also represented that Spongetech had exceeded $12 million in revenue for the three-month-period ending on November 30, 2008. In fact,

as Metter and Moskowitz well knew, or were reckless in not knowing, Spongetech had nowhere near $12 million in revenue for that period because fictitious customers were responsible for "82.9 percent of [Spongetech's] sales."

48.     Spongetech's Second Quarter FY 2009 10-Q also represented that, "[a]s of April 16, 2009, the Company had 722,866,061 shares of common stock issued and outstanding." As of April 16, 2009, the date referenced in Spongetech's Q2 2009 10-Q, Spongetech had approximately 1.6 billion outstanding shares. As Metter and Moskowitz well knew, or were reckless in not knowing, Spongetech's Q2 2009 10-Q understated the number of outstanding Spongetech shares by more than 900 million shares.

49.     Third Quarter FY 2009 10-Q: Spongetech's Q3 2009 10-Q represented that "[f]or the nine months ended February 28, 2009, six customers, SA Trading Company, US Asia Trading, Dubai Export Import Company, Fesco Sales Corp., New Century Media and Walgreens, accounted for 99.4 percent of sales." Spongetech's Q3 2009 10-Q also represented that Spongetech had exceeded $31 million in revenue for the nine-month-period ending on February 28, 2009. In fact, as Metter and Moskowitz well knew, or were reckless in not knowing, Spongetech had nowhere near $31 million in revenue for that period because fictitious customers were responsible for "99.4 percent of [Spongetech's] sales."

50.     Spongetech's sales to Walgreens were on a consignment basis and totaled less than $200,000 for the period.

51.     Metter and Moskowitz, reviewed, approved, and certified Spongetech's false and misleading public filings. Metter and Moskowitz knew, or were reckless in

17

not knowing, that the public filings contained materially false and fraudulent information and statements, and failed to include additional material necessary to make the statements and information, in light of the circumstances in which they were made, not misleading.

52.     Spongetech is delinquent in its filings.  Spongetech is required to file quarterly and annual reports but has failed to file such reports for the periods ended May 31, 2009, August 31, 2009, November 30, 2009, and February 28, 2010.  It has not filed any quarterly or annual reports since April 20, 2009, for the period ended February 28, 2009.  Metter and Moskowitz aided and abetted Spongetech's failure to file the required reports.

### Concealing The Fraud

#### Speranza

53.     Investors and others began to raise questions about Spongetech's purported customers, sales orders, and reported revenue.

54.     On or about September 4, 2009, SEC staff subpoenaed Spongetech seeking customer contact information.  On or about September 9, 2009, Spongetech's auditor also requested customer addresses from Spongetech.

55.     On or about September 1, 2009, RM Enterprises paid Defendant Speranza $10,000.  Nine days later, on or about September 10, 2009, RM Enterprises paid Speranza another $5,000.  Beginning in early September 2009, Speranza created virtual storefronts for the non-existent customers, SA Trading, US Asia, Dubai, Fesco, and New Century, to conceal the fact that they were not real customers.

56.     On or before September 10, 2009, Speranza created and registered websites for SA Trading, US Asia, Dubai, Fesco, and New Century that showcased

Spongetech (and other) products and provided information on how to purchase these products. Speranza created the websites to make the fictitious customers appear to be legitimate businesses

57.     Speranza maintained the websites and had emails sent to the websites forwarded to his own email account. Speranza received emails directed to the websites that asked about Spongetech. Speranza knew that the websites, and the information they contained were publicly available for viewing by Spongetech shareholders.

58.     On or about September 10, 2009, to conceal his identity, Speranza registered the domain names of each "customer" internet website with Domains By Proxy, Inc., a private registration service that prevents access to the personal identifying information of the registrant.

59.     On or about September 25, 2009, Speranza established virtual offices for SA Trading, US Asia, Dubai, Fesco, New Century, and Multi Media Sales (another fictitious customer). On or about September 22, 2009, Speranza contacted DaVinci Virtual Office Solutions ("DaVinci") to arrange for temporary office space for the fictitious companies. Speranza paid DaVinci with a set of gift cards he purchased.

60.     Speranza directed DaVinci to forward all emails, faxes, and voicemails received by the virtual offices to his email address. Speranza created fictitious contact persons for each fictitious company and established accounts in their names, including Steven Chin (U.S. Asia), Jim Rogers (Fesco), and Ahmed Elsayed (Dubai). DaVinci established temporary offices and telephone numbers for the fictitious Spongetech customers.

61.     On or about September 23, 2009, DaVinci terminated Speranza's account. This occurred around the time that the *New York Post* published a series of negative articles about Spongetech, including a reporter's efforts to track down Spongetech's alleged customers.

62.     On or about September 25, 2009, Speranza contacted Regus, another virtual office company, and established virtual offices and telephone numbers for Spongetech's fictitious customers. Speranza again paid with gift cards and used fictitious contact names for each customer, including Steven Chin (U.S. Asia), Jim Rogers (Fesco), and Ahmed Elsayed (Dubai). He also provided Regus with his own email address and telephone number.

63.     On or about September 25, SEC staff contacted Spongetech's counsel and requested that Spongetech immediately produce contact information for the six largest customers identified in its Form 10-Q for the period ended February 28, 2009: SA Trading, US Asia, Dubai, Fesco, New Century, and Walgreens.

64.     On or about September 28, at approximately 5:40 a.m., Metter sent an email to Speranza requesting the contact "numbers that Steven [Moskowitz] said you were going to supply for the regulators." Metter renewed his request throughout the day. At 5:00 p.m., Speranza provided Metter with telephone numbers for SA Trading, Fesco, and US Asia. Those were the same telephone numbers assigned by Regus, the virtual office company.

65.     On or about September 25, 2009, and September 28, 2009, then-counsel for Spongetech provided the Commission with what was purported to be contact information for each of Spongetech's six largest customers. That information included

20

the fictitious contact names Speranza created and the addresses and telephone numbers for each of the virtual offices Speranza established.

66.     Speranza knew, or was reckless in not knowing, that the customers did not exist and that he was misleading the public by creating websites, virtual offices, and other fake information for them.

## False Purchase Orders And Books And Records

67.     Spongetech, Moskowitz, and Metter also furthered and concealed the fraud by directly or indirectly creating materially false and misleading purchase orders, invoices and bills of lading.  On September 4, 2009, SEC staff subpoenaed Spongetech for documents concerning Spongetech's sales and customers.  In or around October 2009, Spongetech, Moskowitz, and Metter caused to be provided false and misleading purchase orders, invoices, and bills of lading to SEC staff.

68.     Metter and Moskowitz were responsible for the adequacy of Spongetech's books and records and the sufficiency of Spongetech's internal controls. Metter and Moskowitz failed to ensure that Spongetech maintained accurate books and records, and they failed to implement effective internal controls.

## THE DUMP

69.     After inflating the price for Spongetech securities through materially false and fraudulent press releases and public filings, Metter, Moskowitz, Spongetech, and RM Enterprises furthered their scheme by dumping approximately 2.5 billion of Spongetech shares on the market in unregistered transactions.

70.     From 2007 to 2009, at the direction of Metter and Moskowitz, Spongetech engaged in a scheme to evade the registration provisions of the securities

laws by engaging in a single, continuous unregistered public offering of securities. In private placement transactions executed between on or about March 15, 2007, and at least September 2009, Spongetech issued approximately 2.5 billion restricted shares to its affiliate, RM Enterprises, and other affiliated entities, when there was no registration statement in effect. Spongetech, at the direction of Metter and Moskowitz, in effect, used RM Enterprises and other affiliates as conduits through which Spongetech dumped its shares.

### Spongetech Issued Shares To RM And Other Affiliates In Unregistered Transactions As Conduits For Public Distribution

71.     To begin the dump, Spongetech, at the direction of Metter and Moskowitz, issued restricted shares to RM Enterprises and other affiliates. In Commission filings, signed by, reviewed, or approved by Metter and Moskowitz, Spongetech claimed the transactions were exempt from Commission registration requirements. In fact, they were neither exempt from registration nor were the transactions registered.

72.     The affiliated entities, beyond RM Enterprises, through which Metter, Moskowitz, and Spongetech funneled Spongetech shares include, but are not limited to, Asset Management Enterprises, AIT Capital, and Wesley Equities. Each of these entities shares an address with RM Enterprises and is owned or controlled by Spongetech, RM Enterprises, their affiliates, or employees. RM Enterprises, for example, wholly owns AIT Capital. Spongetech employees are presidents of AIT Capital, Wesley Equities, and Asset Management Enterprises. All three entities, at the direction of Metter and Moskowitz, also functioned as conduits to funnel proceeds from the unregistered sale of Spongetech stock back to RM Enterprises.

22

73.     Between in or around June 24, 2009, and October 13, 2009, Spongetech distributed approximately over 300 million restricted shares to Asset Management Enterprises, AIT Capital, and Wesley Equities in unregistered transactions. Spongetech distributed the remainder of the 2.5 billion shares to RM Enterprises.

74.     Spongetech, at the direction of Metter and Moskowitz, claimed an exemption and safe harbor under Section 4(2) of the Securities Act and Rule 506 of Regulation D for the offer and sales to RM Enterprises and the other affiliates. Both provisions require the issuer to exercise reasonable care to assure that the securities are purchased for investment and not with a view to public distribution. In fact, these provisions did not apply because Spongetech, at the direction of Metter and Moskowitz, issued the restricted shares for the very purpose of publicly distributing them by funneling them through RM Enterprises and other affiliates as conduits.

### Defendants Metter, Moskowitz, Spongetech, And RM Enterprises Used False And Forged Attorney Opinion Letters To Dump Shares Onto The Public Market

75.     To dump the restricted Spongetech shares onto the market, Metter, Moskowitz, Spongetech, and RM Enterprises obtained and used attorney opinion letters justifying the removal of restricted legends from Spongetech's shares.

76.     RM Enterprises and others, at the direction of Metter and Moskowitz, dumped the restricted shares onto the public market through multiple methods. In one way, Spongetech, Metter, Moskowitz, and RM Enterprises used bogus and false legal opinions citing the guidance under Commission Staff Legal Bulletin No. 4. These opinion letters were sent to Spongetech's transfer agent who then improperly removed restrictive legends from Spongetech shares that were later sold to the public. In another, Spongetech, Metter, Moskowitz, and RM Enterprises used bogus and false

23

opinion letters claiming a safe harbor under Rule 144 of the Securities Act and seeking removal of the restrictive legends from Spongetech shares held by RM Enterprises on that basis, which were later sold to the public. Pensley and Halperin, who authored certain attorney opinion letters, knowingly or recklessly made materially false or misleading statements to Spongetech's transfer agents who then improperly removed restrictive legends from Spongetech shares.

<u>Pensley Letters</u>

77.     In 2007, Pensley, Spongetech's former corporate counsel, was hired to write attorney opinion letters requesting the removal of restrictive legends from Spongetech stock held by purported RM Enterprises shareholders so the stock could be sold into the public market.

78.     From March 15, 2007, to June 19, 2007, Pensley drafted at least four attorney opinion letters, dated on or about March 15, 2007; April 23, 2007; May 18, 2007; and June 19, 2007; each citing Commission Staff Legal Bulletin No. 4 as the basis for removing restrictive legends from Spongetech stock. Pensley, at the direction of or with the knowledge and approval of Metter and Moskowitz, transmitted these four letters to Spongetech's then-transfer agent, Olde Monmouth, resulting in the unlegending of 12,000,000 restricted shares. The bulk of these shares were sold in the public market in unregistered transactions.

79.     Stock may be distributed in an unregistered "spin-off" transaction if certain conditions in Staff Legal Bulletin No. 4 are met. Among other things, the shares distributed by a parent company in the "spin-off" must have been held for at least two years; the "spin-off" must be for a valid business purpose; the shares must be "spun-off" *pro rata* to the parent's

24

shareholders; the parent shareholders may not provide consideration for the "spun-off" shares; and the distribution may not be for value.

80.     In each of the four opinion letters, Pensley falsely represented that RM Enterprises, as the parent of Spongetech, was "spinning-off" shares of Spongetech to RM Enterprises' shareholders, and thus the transfer agent could remove the restrictive legends from the "spun-off" shares. At the time he wrote the four attorney opinion letters, Pensley knew, or was reckless in not knowing, that Staff Legal Bulletin No. 4 did not apply to the transactions and that there was no proper basis to remove the restrictive legends from Spongetech's stock.

81.     For example, Pensley knew that RM Enterprises was issuing the shares for consideration and that the shares were not being "spun off" *pro rata* to RM Enterprises shareholders. Pensley himself received shares in these transactions as *compensation* for his services, and he did not know the ratio of his own shares. Pensley also falsely opined that RM Enterprises had valid business purposes for the issuances, when he knew this representation was untrue.

82.     As Pensley knew, or was reckless in not knowing, no valid exemption or safe harbor from registration applied to the transactions relating to the 12,000,000 restricted Spongetech shares.

<u>Forged Pensley Letters</u>

83.     From July 2007 through May 2009, Moskowitz continued to send and cause to be sent to Olde Monmouth opinion letters Pensley purportedly authored. There were approximately 216 letters issued under Pensley's name between July 2007 and May 2009, which were based on Staff Legal Bulletin No. 4 and resulted in the

removal of restrictive legends on over one billion shares of Spongetech stock RM Enterprises held. These unlegended shares were sold into the public market in unregistered transactions when no exemption or safe harbor from the registration requirements was available.

84.     Although the forged letters contain the same substantive text and false representations as the four previous Pensley letters, they also contain dates and names of the beneficiaries in a different font type and size than Pensley used in the prior letters.

85.     In May 2009, a broker contacted Olde Monmouth to report his concerns about discrepancies and inconsistencies in the typeface and text of the forged Pensley letters. Olde Monmouth contacted Pensley, who verified that he had not written any attorney opinion letters since 2007.

86.     Moskowitz knew that Pensley had not authored the opinion letters he (Moskowitz) sent to Olde Monmouth from July 2007 through May 2009. Moskowitz falsely represented to Olde Monmouth's attorney that Pensley had given him written permission to alter and reuse the opinion letters that Pensley originally drafted.

<u>Moskowitz's "David Bomart" Opinion Letters</u>

87.     In May 2009, Olde Monmouth's attorney received an email purportedly from Spongetech's new lawyer, "David Bomart," copied to Moskowitz and another Spongetech employee. In this email, "Bomart" wrote:

> "Let me introduce myself [sic] I'll be handling the legal opinion for Spongetech Delivery System and R M Enterprises. I'll be working with the Spongetech staffing the next few days to replace all of Mr. Pensley's opinion's [sic] which after review the company didn't forge but [sic] seems to be a monetary dispute which will be resolved in the months to come. I have know [sic] Mr. Moskowitz and the company a long time

[sic] this [sic] not something they would do. So we will be replacing all of Mr. Pensley's opinion's [sic] who has reneged on his deal with the company. How should we proceed [sic] by fedex these opinion's or e-mail them to you or both for your files. Thank you in advance for your cooperation in this matter, [sic]

Also Mr. Moskowitz says your Transfer agent is one of the best he has worked with [sic] can I get cost information to switch some of my public companies to you. I look forward to working with you and your staff in days to come."

88.     On the same day Olde Monmouth's attorney received the "Bomart" email, Moskowitz forwarded to Olde Monmouth the first of nine "Bomart" attorney opinion letters. These nine "Bomart" opinion letters, which were based on Staff Legal Bulletin No. 4, led to the removal of restrictive legends from more than 100 million shares of Spongetech stock held by RM Enterprises which were later sold into the public market.

89.     David Bomart does not exist and is not an attorney licensed to practice law in New York. There also is no law firm named "Bomart, Cone & Rolland," Bomart's purported law firm. Moskowitz knew that David Bomart did not author the nine "Bomart" attorney opinion letters he sent to Olde Monmouth.

90.     After counsel for Olde Monmouth expressed concerns about the authenticity of the "Bomart letters" to Moskowitz, including that the Bomart correspondence letterhead bore Moskowitz's fax number, Moskowitz assured Olde Monmouth's lawyer that Bomart existed and that he worked out of Moskowitz's office on occasion. Moskowitz then offered to set up a conference call between counsel for Olde Monmouth and "Bomart." On the day of the scheduled teleconference call, Moskowitz abruptly fired Olde Monmouth. No further "Bomart" opinion letters were issued.

<u>Halperin Letters</u>

91.     Beginning in June 2009, Spongetech's new transfer agent, Worldwide Stock, began removing restrictive legends and transferring stock based on attorney opinion letters authored by Halperin, one of Spongetech's new attorneys. In his letters, Halperin opined that the holders of the stock complied with the safe harbor provided by Rule 144 of the Securities Act.

92.     Halperin issued ninety-two Rule 144 attorney opinion letters between in or around June 2009 and approximately September 29, 2009, resulting in the removal of restrictive legends from over 922 million shares of Spongetech's stock held by RM Enterprises and other related entities such as Asset Management Enterprises, AIT Capital, and Wesley Equities. These entities functioned as conduits for both the unregistered distribution of Spongetech shares and the funneling of proceeds from sales of the shares back to RM Enterprises.

93.     Each of Halperin's letters opined that the transfer agent could remove the legends from restrictive shares because RM Enterprises, Asset Management Enterprises, AIT Capital, or Wesley Equities had held the securities for six months or longer.

94.     In fact, as Halperin knew, or was reckless in not knowing, for ninety-eight percent of the shares, RM Enterprises, Asset Management Enterprises, AIT Capital, and Wesley Equities had not held the securities for six months or longer.

95.     For example, on or about June 24, 2009, Moskowitz instructed Worldwide Stock to issue 34,000,000 restricted Spongetech shares to RM Enterprises

28

in Share Certificate No. 3864. *On that same day,* Moskowitz used Halperin's letter and instructed Worldwide Stock to remove restrictive legends from the shares and transfer them to Diomede Corp. and Maremmano Corp.

96.     Similarly, on or about June 29, 2009 and July 10, 2009, Moskowitz instructed Worldwide Stock to issue 10,000,000 restricted Spongetech shares to RM Enterprises in Share Certificate Nos. 3901 and 3902 and No. 4001. On July 8, 2009 and July 15, 2009, Moskowitz used Halperin's letters to instruct Worldwide Stock to remove restrictive legends from those share certificates and transfer the now-unlegended shares to another person, Myron Weiner. RM Enterprises had held the shares for approximately nine days or fewer.

97.     Spongetech purported to issue the restricted shares to RM Enterprises in repayment of approximately thirty-five purported loans that RM Enterprises had made to Spongetech between December 31, 2007, and March 17, 2008. Under certain circumstances where stock is issued to repay a loan, the holding period for the stock can be measured in reference to the date the loan is disbursed. However, Halperin knew, or was reckless in not knowing, that these loans had not actually been made and that the purported loans, and the loan documents purporting to reflect them, were shams.

98.     At the earliest, the holding period for RM Enterprises' restricted shares began when Spongetech issued the shares to RM Enterprises, which was sometimes as little as one day before Halperin's opinion letters caused the transfer agent to remove the restrictive legends from the stock for transfer to entities and persons who sold them into the public market. Halperin knew, or was reckless in not knowing, that RM

29

Enterprises failed to meet the required holding period under Rule 144 of the Securities Act.

99.   Halperin also issued nineteen letters after August 31, 2009, in which he opined that the transfer agent could remove restrictive legends because the public had "adequate current information" about Spongetech when the transactions took place. This resulted in Worldwide Stock removing restrictive legends from approximately 165,963,360 restricted Spongetech shares for 29 beneficiaries.

100.   In fact, Spongetech had not filed its annual report for the year ended May 31, 2009, or issued any financial statements since its last SEC filing in April 2009. Halperin knew, or was reckless in not knowing, that the public thus did not have adequate current information about Spongetech and its financial condition.

101.   As Halperin knew, or was reckless in not knowing, no valid exemption from registration or safe harbor applied to the transactions relating to the 922 million restricted Spongetech shares, and the transactions were not registered.

## Stock Is Sold By Entities Affiliated with Metter and Moskowitz In Unregistered Transactions

102.   Having improperly caused the transfer agents to remove restrictive legends from restricted Spongetech shares, Metter, Moskowitz, Spongetech, and RM Enterprises then distributed the shares through RM Enterprises and other affiliates in unregistered transactions to numerous other persons and entities.

103.   Some of the entities to whom RM Enterprises and other affiliates distributed shares, such as Flo Weinberg (wholly owned subsidiary of RM Enterprises); Tiburon Capital Group; D.L. Investments (wholly owned by Metter's wife); and Business Talk Radio (a Metter corporation), are closely affiliated with, or friendly to,

30

Metter and Moskowitz. These entities, directly or indirectly, received shares or proceeds from, Spongetech and RM Enterprises. They also, directly or indirectly, sent proceeds to Spongetech and RM Enterprises resulting from improper, unregistered, transactions.

104.    In their capacity as officers of RM Enterprises, Metter and Moskowitz signed multiple corporate resolutions approving the improper removal of restricted legends from millions of shares of Spongetech stock, and the subsequent assignment and transfer of that stock to various entities and persons affiliated with Metter and Moskowitz, such as Flo Weinberg, Tiburon Capital, D.L. Investments, and Asset Management Enterprises.

105.    As the primary executive officers of Spongetech and RM Enterprises, Metter and Moskowitz directly or indirectly controlled Spongetech and RM Enterprises. They possessed the power and ability to control Spongetech's and RM Enterprises' fraudulent conduct described herein.

106.    Metter and Moskowitz, directly or indirectly, made millions of dollars in profit from the sale of Spongetech shares that eventually were distributed to the public market.

## SECTION 304 OF THE SARBANES-OXLEY ACT OF 2002

107.    By virtue of misconduct, Defendant Spongetech filed the following periodic reports with the SEC which were in material noncompliance with financial reporting requirements under the securities laws including Generally Accepted Accounting Principles ("GAAP"):

o   Form 10-QSB filed October 15, 2007 for the period ended August 31, 2007;

31

o   Form 10-QSB filed January 14, 2008 for the period ended November 30, 2007;

o   Form 10-QSB filed April 15, 2008 for the period ended February 29, 2008;

o   Form 10-KSB filed August 29, 2008 for the period ended May 31, 2008;

o   Form 10-Q filed on October 15, 2008 for the period ended August 31, 2008;

o   Form 10-Q filed on January 14, 2009 for the period ended November 30, 2008;

o   Form 10-Q filed on April 20, 2009 for the period ended February 28, 2009.

Due to Spongetech's material noncompliance with its financial reporting requirements under the securities laws, and as a result of misconduct, Spongetech is therefore required to prepare and file accounting restatements with the Commission for these filings.

108.    Defendants Metter and Moskowitz received bonuses and/or other incentive-based and equity-based compensation during the twelve months following the filing with the SEC of the foregoing periodic filings embodying financial reporting requirements.  Additionally, Moskowitz and Metter realized profits from their sales of Spongetech securities during the relevant periods.

109.    Defendants Metter and Moskowitz have not, as required by Section 304 of the Sarbanes-Oxley Act,  reimbursed Spongetech for the bonuses, compensation, and/or profits realized during the relevant time period, and the SEC has not exempted Metter and Moskowitz from the application of Section 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243.

110.    By engaging in the conduct described above, Defendants Metter and Moskowitz have violated Section 304(a) of the Sarbanes-Oxley Act, 15 U.S.C. § 7243(a).

## FIRST CLAIM

## Violations of Section 17(a) of the Securities Act

(Spongetech, RM Enterprises, Metter, Moskowitz, Pensley, and Halperin)

111.    Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

112.    Defendants Spongetech, RM Enterprises, Metter, Moskowitz, Pensley, and Halperin have, directly or indirectly, singly or in concert, by use of means or instrumentalities of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities: (a) knowingly or recklessly employed devices, schemes or artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of any untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading; and (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

113.    By engaging in the conduct described above, Defendants Spongetech, RM Enterprises, Metter, Moskowitz, Speranza, Pensley, and Halperin violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

## Violations of Exchange Act Section 10(b) and Rule 10b-5

(Spongetech, RM Enterprises, Metter, Moskowitz, Speranza, Pensley, and Halperin)

114.    Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

115.    Defendants Spongetech, RM Enterprises, Metter, Moskowitz, Speranza, Pensley, and Halperin have, directly or indirectly, singly or in concert, by use of means

33

or instrumentalities of transportation or communication in interstate commerce or by use of the mails, or any facility of any national securities exchange, knowingly or recklessly, in connection with the purchase or sale of securities:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

116.    By engaging in the conduct described above, Defendants Spongetech, RM Enterprises, Metter, Moskowitz, Speranza, Pensley, and Halperin violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## THIRD CLAIM

### Control Person Liability for Violations of Exchange Act Section 10(b) and Rule 10b-5

(Metter and Moskowitz)

117.    Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

118.    Defendants Metter and Moskowitz, as the primary executive officers of Spongetech and RM Enterprises, (a) directly or indirectly controlled Spongetech and RM Enterprises; (b) possessed the power and ability to control Spongetech and RM Enterprises as to their violations of Exchange Act Section 10(b) and Rule 10b-5; (c) were in some meaningful sense culpable participants in Spongetech's and RM Enterprises' violations of Exchange Act Section 10(b) and Rule 10b-5, including by knowingly and recklessly authorizing, and causing, Spongetech to issue false and

34

misleading statements in press releases and public filing, and by knowingly and recklessly causing Spongetech to illegally distribute restricted shares to the public market through RM Enterprises in unregistered transactions.

119.    Defendants Metter and Moskowitz are jointly and severally liable with and to the same extent as Spongetech and RM Enterprise for Spongetech's and RM Enterprises' violations of Exchange Act Section 10(b) and Rule 10b-5, as stated above in the Second Claim for Relief.

120.    By engaging in the conduct described above, Defendants Metter and Moskowitz violated, Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] by controlling, and possessing the power and ability to control, Spongetech and RM Enterprises in their violations of Exchange Act Section 10(b) and Rule 10b-5.

## FOURTH CLAIM

### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5

(Speranza)

121.    Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

122.    Defendant Speranza knowingly provided substantial assistance to Spongetech, Metter, and Moskowitz in those Defendants' violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, as stated above in the Third Claim for Relief.

123.    By engaging in the conduct described above, Defendant Speranza violated Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting violations of Section 10(b) and Rule 10b-5.

## FIFTH CLAIM

### Violations of Sections 5(a) and (c) of the Securities Act

(Spongetech, RM Enterprises, Metter, Moskowitz, Pensley, and Halperin)

124.   Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

125.   Defendants Spongetech, RM Enterprises, Metter, Moskowitz, Pensley, and Halperin directly or indirectly, singly or in concert with others:  (a) without a registration statement in effect as to the securities transactions, (i) made use of the means or instrumentalities of transportation or communication or the mails in interstate commerce to sell securities through the use or medium of a prospectus or otherwise, or (ii) carried or caused to be carried such securities for the purpose of sale or for delivery after sale; and (b) made use of the means or instrumentalities of transportation or communication or the mails in interstate commerce to offer to sell or offer to buy through the use or medium of a prospectus or otherwise securities as to which a registration statement had not been filed as to such securities.

126.   By engaging in the conduct described above, Defendants Spongetech, RM Enterprises, Metter, Moskowitz, Pensley, and Halperin violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) & (c)].

## SIXTH CLAIM

### Violations of Exchange Act Section 15(d) and Rules 12b-20, 15d-1, 15d-11, and 15d-13 and Aiding and Abetting

(Spongetech, Metter, and Moskowitz)

127.   Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

128.   Section 15(d) of the Exchange Act and Rules 15d-1, 15d-11, and 15d-13 require issuers with an effective Securities Act registration statement to file with the

Commission accurate periodic reports. Rule 12b-20 of the Exchange Act requires that periodic reports contain any additional material information necessary to make the required statements made in the reports not materially misleading.

129. Defendant Spongetech filed reports with the Commission that contained materially false and misleading statements and information, and failed to include additional material necessary to make the statements and information, in light of the circumstances in which they were made, not misleading, in violation of Section 15(d) of the Exchange Act and Rules 12b-20, 15d-1, 15d-11, and 15d-13 the Exchange Act.

130. Defendants Metter and Moskowitz knowingly provided substantial assistance to Defendant Spongetech in the commission of these violations.

131. By reason of the foregoing, Defendant Spongetech violated Section 15(d) of the Exchange Act and Rules 12b-20, 15d-1, 15d-11, and 15d-13 the Exchange Act, and Defendants Metter and Moskowitz violated Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting those violations.

## SEVENTH CLAIM

### Violations of Exchange Act Section 13(a) and Rule 13a-13 and Aiding and Abetting

(Spongetech, Metter and Moskowitz)

132. Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

133. Section 13(a) and Rule 13a-13 of the Exchange Act requires issues with securities registered pursuant to Section 12 of the Exchange Act to file quarterly reports with the Commission. Defendant Spongetech failed to file with the SEC such reports.

134. Defendants Metter and Moskowitz knowingly provided substantial assistance to Defendant Spongetech in the commission of these violations.

135.    By reason of the foregoing, Defendant Spongetech violated Section 13(a) and Rule 13a-13 of the Exchange Act, and Defendants Metter and Moskowitz violated Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting those violations.

### EIGHTH CLAIM

### Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) and Aiding and Abetting

(Spongetech, Metter, and Moskowitz)

136.    Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

137.    Defendant Spongetech failed to (i) maintain and keep books, records, and accounts, which, in reasonable detail,  accurately and fairly reflected the transactions and dispositions of its assets, and (ii) devise and maintain a system of internal accounting controls sufficient to provides reasonable assurances that: (a) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; and (b) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

138.    Defendants Metter and Moskowitz knowingly provided substantial assistance to Defendant Spongetech in the commission of these violations.

139.    By engaging in the conduct described above, Defendant Spongetech violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Defendants Metter and Moskowitz violated Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]

by aiding and abetting those violations.

## NINTH CLAIM

### Violations of Exchange Act Sections 13(b)(5) And Exchange Act Rule 13b2-1

(Metter and Moskowitz)

140.    Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

141.    Defendants Metter, and Moskowitz knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified, directly or indirectly, or caused to be falsified, books, records, or accounts of Spongetech maintained pursuant to Exchange Act Section 13(b)(2) [15 U.S.C. § 78m(2)], and directly or indirectly falsified or caused to be falsified books, records, or accounts of Spongetech that were subject to Exchange Act Section 13(b)(2)(A).

142.    By engaging in the conduct described above, Defendants Metter and Moskowitz violated Section 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1.

## TENTH CLAIM

### Violations of Exchange Act Rule 15d-14

(Metter and Moskowitz)

143.    Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

144.    Defendants Metter and Moskowitz, directly or indirectly, signed personal certifications indicating that they had reviewed Spongetech's periodic reports containing financial statements filed with the SEC pursuant to Section 15(d) of the Exchange Act and that (a) based on their knowledge, these reports do not contain any untrue statements of material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by the reports; (b) based on their knowledge, that information contained in these reports fairly present, in all material respects, the financial condition and results of Spongetech's operations; and (c) that they had disclosed to Spongetech's auditors all significant deficiencies in internal controls and all instances of fraud.  Defendants Metter and Moskowitz knew or should have known that these certifications were false.

145.    By engaging in the conduct described above, Defendants Metter and Moskowitz violated Exchange Act Rule 15d-14.

## ELEVENTH CLAIM

## Violations of Exchange Act Rule 13b2-2

### (Moskowitz)

146.    Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

147.    Defendant Moskowitz, a Spongetech officer and director, (1) made or caused to be made materially false or misleading statements to Spongetech's auditors, or omitted to reveal material facts necessary to make statements made, in light of the circumstances under which such statements were made, not misleading, to its auditor in connection with an audit or review of Spongetech's financial statements or documents or reports required to be filed with the SEC, and (2) directly or indirectly acted to manipulate, mislead, or fraudulently influence Spongetech's auditors as in the performance of an audit or review of Spongetech's financial statements or documents or reports required to be filed with the SEC, knowing that such actions, if successful, could result in rendering Spongetech's financial statements materially misleading.

148.   By engaging in the conduct described above, Defendant Moskowitz violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13b2-2.

## TWELFTH CLAIM

### Violations of Section 304 of the Sarbanes-Oxley Act of 2002

(Spongetech, Metter, and Moskowitz)

149.   Paragraphs 1 – 110 are hereby realleged and incorporated by reference.

150.   By virtue of misconduct, Defendant Spongetech filed the following periodic reports with the SEC which were in material noncompliance with financial reporting requirements under the securities laws including Generally Accepted Accounting Principles ("GAAP"):

- o  Form 10-QSB filed October 15, 2007 for the period ended August 31, 2007;

- o  Form 10-QSB filed January 14, 2008 for the period ended November 30, 2007;

- o  Form 10-QSB filed April 15, 2008 for the period ended February 29, 2008;

- o  Form 10-KSB filed August 29, 2008 for the period ended May 31, 2008;

- o  Form 10-Q filed on October 15, 2008 for the period ended August 31, 2008;

- o  Form 10-Q filed on January 14, 2009 for the period ended November 30, 2008;

- o  Form 10-Q filed on April 20, 2009 for the period ended February 28, 2009.

Due to Spongetech's material noncompliance with its financial reporting requirements under the securities laws, and as a result of misconduct, Spongetech is therefore required to prepare and file accounting restatements with the Commission for these filings.

151.   Defendants Metter and Moskowitz received bonuses and/or other incentive-based and equity-based compensation during the twelve months following the filing with the SEC of

the foregoing periodic filings embodying financial reporting requirements. Additionally, Moskowitz and Metter realized profits from their sales of Spongetech securities during the relevant periods.

152.    Defendants Metter and Moskowitz have not, as required by Section 304 of the Sarbanes-Oxley Act, reimbursed Spongetech for the bonuses, compensation, and/or profits realized during the relevant time period, and the SEC has not exempted Metter and Moskowitz from the application of Section 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243.

153.    By engaging in the conduct described above, Defendants Metter and Moskowitz have violated Section 304(a) of the Sarbanes-Oxley Act, 15 U.S.C. § 7243(a).

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter an order:

a) preliminarily and permanently enjoining Defendant Spongetech from violations of Sections 5(a), 5(c) and 17(a) of the Securities Act  [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)], and 78o(d), and Exchange Act Rules 10b-5, 12b-20, 13a-13 and 15d-1, 15d-11, and 15d-13 [17 C.F.R. §§ 240.10b-5, 12b-20, 13a-1 & 13a-13, 15d-1, 15d-11, and 15d-13];

b) preliminarily and permanently enjoining Defendant RM Enterprises from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

c) preliminarily and permanently enjoining Defendant Steven Moskowitz from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, Exchange Act Rules 10b-5, 13b2-1, 13b2-2, and 15d-14, and Section 304 of the Sarbanes-Oxley Act of 2002, from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act and Exchange Act Rules 12b-20, 13a-13, 15d-1, 15d-11, and 15d-13;

d) preliminarily and permanently enjoining Defendant Michael Metter from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, Exchange Act Rules 10b-5, 13b2-1, 13b2-2, and 15d-14, and Section 304 of the Sarbanes-Oxley Act of 2002, from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act and Exchange Act Rules 12b-20, 13a-13, 15d-1, 15d-11, and 15d-13;

e) preliminarily and permanently enjoining Defendant George Speranza from violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, and from aiding and abetting violations of Sections 10(b) of the Exchange Act and Exchange Act Rule 10b-5;

f) preliminarily and permanently enjoining Defendants Joel Pensley and Jack Halperin from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5;

g) that Defendants Spongetech, RM Enterprises, Metter, Moskowitz, Speranza, Pensley, and Halperin pay civil penalties under Section 20(d) of

the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)];

h) that Defendants Spongetech, RM Enterprises, Metter, Moskowitz,

Speranza, Pensley, and Halperin disgorge, with prejudgment interest, any

ill-gotten gains and provide an accounting of monies and shares of

Spongetech stock that they received and the disposition of such monies

and stock;

i)  permanently barring Defendants Metter and Moskowitz, pursuant to

Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an

officer or director of any issuer that has a class of securities registered

pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is

required to file reports pursuant to Section 15(d) of the Exchange Act [15

U.S.C. § 78o(d)];

j)  prohibiting Defendants Metter, Moskowitz, Speranza, Pensley, and

Halperin from engaging in any offering of penny stock pursuant to

Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act

Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

k) that Defendants Metter and Moskowitz forfeit any bonuses or incentive-

based or equity-based compensation, and profits obtained from the sale of

Spongetech securities as required by Section 304 of the Sarbanes-Oxley

Act of 2002 [15 U.S.C. § 7243], to the extent such proceeds are not

otherwise ordered to be disgorged;

l) preliminarily and permanently freeze the assets of Defendants Spongetech, RM Enterprises, Metter, and Moskowitz to retain such assets for distributions to the victims of the scheme;

preliminarily and permanently bar Defendants Pensley and Halperin from providing professional services to any person or entity in connection with the offer or sale or securities, including but not limited to, participating in the preparation or issuance of any attorney opinion letter related to such offerings; and

m) grant such other relief as this Court may deem just and proper.

Respectfully submitted,

<u>Of Counsel</u>
Christopher R. Conte
Charles E. Cain
Jeffrey T. Tao
Christine Neal
Uta von Eckartsberg
Charles Davis
Amybeth García-Bokor
Securities and Exchange
Commission
100 F Street NE
Washington, D.C. 20549-
4010
202-551-4411 (Tao)
202-772-9246 (fax) (Tao)

Dated:  May 5, 2010

Richard E. Simpson (RS5859)
Attorney for Plaintiff

Securities and Exchange Commission
100 F Street NE
Washington, D.C.  20549-4030
202-551-4492 (Simpson)
202-772-9245 (Simpson fax)