UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 10-CV-2031 |
| | : | (DLI) |
| SPONGETECH DELIVERY SYSTEMS, INC., | : | |
| RM ENTERPRISES INTERNATIONAL, INC., | : | |
| STEVEN Y. MOSKOWITZ, MICHAEL E. | : | |
| METTER, GEORGE SPERANZA, JOEL | : | |
| PENSLEY, and JACK HALPERIN, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION, ASSET FREEZE, AND OTHER RELIEF

Richard E. Simpson
100 F Street N.E.
Washington, D.C. 20549-4030
202-551-4492
202-772- 9245 (FAX)
Attorney for Plaintiff

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

I.  Defendants Metter, Moskowitz, and Spongetech Made Numerous False Or
    Misleading Statements To The Public Regarding Spongetech's Business ............. 4

   A.  Spongetech's Significant Customers, and Their Orders, Were Fictitious ......... 5

   B.  Metter, Moskowitz, and Spongetech Vastly Overstated Spongetech's
       Revenue ...................................................................................................... 7

   C.  Metter, Moskowitz, and Spongetech Vastly Understated Spongetech's
       Outstanding Shares ...................................................................................... 7

II.  Defendant Speranza Created Websites And Virtual Offices For The Fictitious
     Customer. ..................................................................................................... 8

III.  Metter, Mosokowski, and Spongetech Used RM Enterprises And Other As
      Conduits To Distribute Restricted Spongetech Shares To The Public In
      Unregistered Transactions ............................................................................. 9

IV.  Defendants Pensley and Halperin Rendered Baseless Attorney Opinion
     Letters .......................................................................................................... 10

   A. Pensley ...................................................................................................... 10

   B. Halperin ..................................................................................................... 12

V.  Spongetech Shares Continue To Trade In The Grey Market .............................. 14

ARGUMENT ................................................................................................... 15

   I.  The Court Should Enter A Preliminary Injunction Restraining The
       Defendants From Violating The Securities Laws ............................................ 15

       A.  The Standard For Emergency Relief ........................................................ 15

B.  The Defendants Are Engaged In Violations Of The Securities Laws ......................................................................................... 16

1. Defendants Violated The Antifraud Provisions............................ 17

2. Defendants Violated The Registration Provisions......................... 19

3. Spongetech Violated The Books And Records Provisions............ 20

C.  The Defendants Are Likely To Commit Future Violations ............. 20

II.  The Court Should Freeze The Assets Of Defendants Metter, Moskowitz, Spongetech, And RM Enterprises ................................................................. 22

III.  The Courts Should Order An Accounting And Forbid The Destruction Of Evidence ........................................................................................................ 23

CONCLUSION ............................................................................................................ 24

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Aaron v. SEC*, 446 U.S. 680 (1980) ............................................................................... 16

*Basic v. Levinson*, 485 U.S. 224 (1988)........................................................................... 16

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ...................................................................... 15

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)......................... 16

*Levi Strauss & Co. v. Sunrise International Trading, Inc.*, 51 F.3d 982 (11th Cir. 1995) ................................................................................................................................. 16

*SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004) ................................................................. 17

*SEC v. Cavanagh*, 155 F.3d 129 (2nd Cir. 1998) ........................................... 15, 20, 21, 22

*SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90 (2d Cir. 1978)................ 21

*SEC v. Grossman*, 887 F. Supp. 649 (S.D.N.Y. 1995) ..................................................... 23

*SEC v. Heden*, 51 F. Supp. 2d 296 (S.D.N.Y. 1999) ........................................................ 22

*SEC v. Estate of Hirschberg*, 101 F.3d 109 (2d Cir. 1996)............................................... 23

*SEC v. Lorin*, 76 F.3d 458 (2d Cir. 1996) ........................................................................ 22

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)............................ 15, 20

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972)........................... 20, 22

*SEC v. Phan*, 500 F.3d 895 (9th Cir. 2007) ..................................................................... 17

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ............................................................. 17

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ......................................................... 15

*SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195 (11th Cir. 1999) ................. 15-16

*SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007)................................. 17

*SEC v. Universal Major Industrial Corp.*, 546 F.2d 1044 (2d Cir. 1976) ........................ 17

## FEDERAL STATUTES

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] ............................................ 1, 16

Section 5 of the Securities Act [15 U.S.C. § 77e ........................................................ 1, 17

Rule 10b-5 [17 C.F.R. § 240.10b-5] ......................................................................... 1, 16

Section 13(a), 13(b), and 15(d) of the Exchange Act [15 U.S.C. 78m(a), 78m(b),
     and 78o(d)], and Exchange Act Rules 12b-20, 13a-13 and 15d-1, 15d-11, and
     15d-13 [17 C.F.R. §§ 240.10b-5, 12b-20, 13a-1 & 13a-13, 15d-1, 15d-11]............... 20

Securities Act Rule 506 [15 U.S.C. §77d(2)] ................................................................ 9

Section 21(d)(1) of the Exchange Act, [15 U.S.C. § 78u(d)(1)] ...................................... 15

## MISCELLANEOUS

Complaint, Spongetech Delivery Systems, Inc., et al. v. NYP Holdings, Inc., et
     al., (New York Sup. Ct. 2010) (Index No. 10601047)............................................... 14

Floyd Norris, *Penny Stock Finds Itself in a Corner*, N.Y. TIMES, May 5, 2010, at
     B1. ............................................................................................................................. 2

*In the Matter of Joel Pensley*, Rel. No. 34-40890 (January 7, 1999)................................22

*SEC v. DiMauro, et al*, No. 98 Civ. 6349 (LAP) (S.D.N.Y. filed Sept. 9, 1998) ....... 10, 22

## PRELIMINARY STATEMENT

Plaintiff, the Securities and Exchange Commission (the "SEC"), respectfully submits this memorandum in support of its Motion for a Preliminary Injunction, an Order Freezing Assets, and Granting Other Relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, Section 20(b) of the Securities Act of 1933 ("Securities Act") and Sections 21(d) & (e) of the Securities Exchange Act of 1934 ("Exchange Act"). On May 5, 2010, the SEC filed a complaint in the United States District Court for the Eastern District of New York. *See* Complaint (Attachment A). The Complaint charges the Defendants with fraud in violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"), and with violations of Section 5 of the Securities Act, as well as other violations.

This case arises from an elaborate fraudulent scheme, involving Defendants Spongetech Delivery Systems, Inc. ("Spongetech"); Spongetech's Chief Executive Office and President, Michael Metter ("Metter"); Spongetech's Chief Operating Officer, Chief Financial Officer, Chief Accounting Officer, and Secretary, Steven Moskowitz ("Moskowitz); Spongetech's majority shareholder, RM Enterprises International, Inc. ("RM Enterprises"); George Speranza ("Speranza"), a self-employed consultant associated with Spongetech; and Joel Pensley ("Pensley"); and Jack Halperin ("Halperin"), two attorneys who provided opinion letters relating transactions involving Spongetech shares, to "pump" the value of Spongetech's shares and "dump" Spongetech shares into the public market in unregistered transactions. To date, the Defendants' scheme has resulted in the illegal distribution of over 2.5 billion Spongetech shares.

The SEC's Complaint alleges, among other things, that:

1

Defendants Moskowitz, Metter, and Spongetech made numerous false statements in press releases and public filings to "pump" demand for shares of Spongetech, a company that sells soap-filled sponges. Moskowitz, Metter, and Spongetech materially exaggerated Spongetech's orders and revenue and touted business with fictitious customers. (Complaint ¶ 2.) They also vastly understated the number of Spongetech's outstanding shares. (Complaint ¶ 8.)

Defendants Moskowitz, Metter, and Spongetech "dumped" the shares by distributing them illegally in unregistered transactions to Defendant RM Enterprises and other affiliates. (Complaint ¶ 6.) RM Enterprises and the other affiliates then served as conduits for the Defendants to illegally distribute Spongetech shares to the public market. Defendants Moskowitz, Metter, Spongetech, and RM Enterprises used baseless attorney opinion letters, rendered by Defendants Pensley and Halperin, which were sent to Spongetech's transfer agents who then improperly removed restrictive legends from the shares for subsequent public distribution. (Complaint ¶ 7.) Defendant Speranza participated in the fraud by establishing virtual offices and maintaining websites for fictitious Spongetech customers. (Complaint ¶ 4.)

The conduct of Defendants Metter, Moskowitz, and Spongetech has continued to the present. Spongetech has continued to issue press releases touting its financial performance, including as recently as April 2010 when it issued a press release, quoting Moskowitz, claiming that the market for Spongetech products was rapidly expanding and now included over 45,000 retail locations in North America. As recently as May 4, 2010, Moskowitz told the *New York Times* that Spongetech's profit claims would be "vindicated" and that Spongetech "had 723 million shares outstanding, just as it had reported" in its financial statement. Floyd Norris, *Penny Stock Finds Itself in a Corner*, N.Y. TIMES, May 5, 2010, at B1.

2

Spongetech shares traded on the Over–the-Counter Bulletin Board until October 5, 2009, when the SEC suspended Spongetech's trading. Since the expiration of that ten day suspension, Spongetech shares have traded on the grey market, on which securities that are not quoted in any quotation service are traded. (Declaration of Stephen Glascoe ("Glascoe Decl.") ¶ 7.) In total, Spongetech, RM Enterprises, Metter, and Moskowitz have directly, or indirectly, profited in the millions of dollars from the scheme.

The SEC requests that the Court preliminarily enjoin Defendants from, among other things, violating the general antifraud and registration provisions of the federal securities laws and requiring or barring other conduct as described further below. As demonstrated below, the SEC has satisfied the standard applicable in securities enforcement actions for the granting of the requested emergency relief. Any burdens imposed upon Defendants Spongetech, RM Enterprises, Metter, and Moskowitz by freezing their assets are outweighed by the need to prevent the dissipation or secretion of the assets.

## STATEMENT OF THE FACTS

This case involves a scheme by Defendants Metter, Moskowitz, Spongetech, and RM Enterprises to illegally increase demand for, and thus the price of, Spongetech's stock. Metter, Moskowitz, and Spongetech then illegally distributed the shares in unregistered transactions to affiliates, such as RM Enterprises,[1] which act as conduits to improperly resell the shares in the public market in further unregistered transactions.

---

[1] Metter and Moskowitz control both Spongetech and RM Enterprises, which is the majority shareholder of Spongetech. (Declaration of Charles Davis, Jr. ("Davis Decl.") ¶ 9 Ex.L.)

I.      **Defendants Metter, Moskowitz, and Spongetech Made Numerous False Or Misleading Statements To The Public Regarding Spongetech's Business**

Beginning in approximately April 2007, and continuing through the present, Defendants Metter, Moskowitz, and Spongetech have painted a prosperous picture of Spongetech's business. In reality, however, Spongetech has had little business and few customers.[2]

To paint the misleading picture, Defendants Metter, Moskowitz, and Spongetech have made numerous materially false or misleading statements in press releases and public SEC filings with respect to at least three things: (1) the existence of orders from, and business with, five customers -- SA Trading, US Asia Distribution Company or US Asia Trading ("US Asia"), Dubai Export Import Company ("Dubai"), Fesco Sales Corp. ("Fesco"), and New Century Media ("New Century"); (2) Spongetech's revenues, which were largely based on purported orders from the foregoing fictitious customers and, therefore, are grossly exaggerated; and (3) Spongetech's reduction of the number of its outstanding shares. (*See generally* Declaration of Christine Neal ("Neal Decl.") and Davis Decl.).

Between April 2007 and May 2010, Spongetech issued several press releases, often directly quoting Metter or Moskowitz, touting Spongetech's customers and financial performance. For example, on April 30, 2007, Spongetech issued a press release claiming that it had "signed a Letter of Intent (LOI) to sell 1,500,000 Car Wash and Car Wax sponges to exporter, SA Trading Group Corp. * * * an exporter of automotive products to South America." (Davis Decl. ¶ 7, Ex. C.) This press release also quoted Moskowitz touting Spongetech's relationship with SA Trading. Similarly, on September 1, 2009, Spongetech issued a press

---

[2]      Indeed, from Spongetech's inception in 1999 through approximately May 31, 2007, the bulk of the Company's sales were attributable to a single customer. (Davis Decl. ¶ 6, Ex. B.)

release, which quoted both Metter and Moskowitz, touting its strong financial results.  (Davis
Decl. ¶ 10, Ex. F.)

Spongetech, Metter, and Moskowitz made similar representations in Spongetech's public
filings.  In Spongetech's publicly-filed Form 10-Q for the quarter ending February 28, 2009, for
example, it reported revenue in excess of $30 million and stated that 99.4% of its sales were
attributable to six customers: SA Trading, Dubai, US Asia, Fesco, New Century and Walgreens.
(Neal Decl. ¶ 8, Ex. B.)  Moskowitz and Metter each reviewed and authorized press releases and
signed and certified public filings before they were issued.  (*Id.*)

A.  Spongetech's Significant Customers, and Their Orders, Were Fictitious

In truth, Defendants Metter's, Moskowitz's and Spongetech's public statements were
largely fiction.  The five customers primarily touted in Spongetech's press releases and public
filings *did not exist*:  SA Trading, US Asia, Dubai, Fesco, and New Century.  (*See generally* Neal
Decl.)  Not only has SEC staff been unable to verify the existence of the purported customers,
but Spongetech's bank records demonstrate that Spongetech never received payments for the
business with these customers that Metter, Moskowitz, and Spongetech touted in their public
statements.  (*See generally* Davis Decl.)

All attempts by SEC staff to contact the five customers confirmed that they never existed.
Beginning in or around September 2009, SEC staff tried to contact each customer by phone
using information that Spongetech's counsel provided; sent subpoenas to the customers' listed
addresses; and searched several databases and the internet to locate information about the
customers.  (*See generally* Neal Decl.)  Staff tried calling contact numbers Spongetech provided
and left voice messages for each, but still was unable to verify the customers' existence.  (Neal
Decl. ¶ 19.)  Although staff located one business by the name New Century, it was not the New

Century with which Spongetech claimed a business relationship. Rather, New Century's counsel disclaimed any relationship between New Century and Spongetech. (Neal Decl. ¶ 18, Ex. P.) The subpoena to another purported customer, Dubai, was returned as undeliverable on March 17, 2010. (Neal Decl. ¶ 16, Ex. K.) SEC staff learned that the customers' addresses were virtual offices that Defendant Speranza had only recently established to conceal the fraud. (Neal Decl. ¶¶ 26, 28, 47(b), Ex. U & Ex. SS at 86-91, 167-176); *see also infra* Part II (discussing Speranza's creation of websites and virtual office space to conceal the fact that the customers did not exist)). Speranza also admitted, in an SEC staff interview, that he made up contact names for the customers, such as Ahmed Elsayed, Jim Rogers, Helen Simms, and Steven Chin. (Neal Decl. ¶ 47(a), Ex. SS at 94, 102-104.) Notably, in their SEC staff interviews, Moskowitz claimed that he had *spoken to* Chin, Rogers, Simms, and Elsayed, (Neal Decl. ¶ 48, Ex. SS at 403-415), and Metter claimed to have met Elsayed. (Neal Decl. ¶ 49, Ex. SS at 272-273.)

SEC staff also subpoenaed information about Spongetech's bank records, and Spongetech identified a single corporate bank account at TD Bank. (Davis Decl. ¶ 14, Ex. I.) Spongetech's records for that account during the time period November 2007 through October 2009 show that bank credit memo transfers from RM Enterprises, *not customer orders*, were the source of the majority of funds flowing into Spongetech. (Davis Decl. ¶¶ 14-21.) None of the funds that went into Spongetech's account can be attributed to the sale of Spongetech products to SA Trading, US Asia, Dubai, Fesco, or New Century. (Davis Decl. ¶¶ 14-21.)

Spongetech's auditor also sought to confirm Spongetech's customer information order in connection with a financial statement audit. The auditor's September 9, 2009, mail requests for information from the customers were returned as undeliverable. (Neal Decl. ¶ 10(b), Ex. F.) In response to SEC staff inquiries, Spongetech produced purchase orders which contained the

6

names of the same customer contact persons that Speranza made up, the phone numbers of the

virtual offices he established, and customer addresses that reflect shipping ports, and an airport

terminal, rather than actual customer business addresses.  (Neal Decl. ¶¶ 50-53, Ex. PP.)

B.      Metter, Moskowitz, and Spongetech Vastly Overstated Spongetech's Revenue

Defendants Metter, Moskowitz, and Spongetech also vastly overstated Spongetech's

revenue in their public statements.  For example, Spongetech's publicly-filed Form 10-Q for the

quarter ending February 28, 2009, reported revenue in excess of $30 million, and attributed

99.4% of its sales to six customers, *five of which do not exist*:  SA Trading, Dubai, US Asia,

Fesco, New Century and Walgreens.  (Neal Decl. ¶ 8, Ex. B.)  The sixth customer, Walgreens,

purchased orders only on a consignment basis totaling approximately $200,000 for the relevant

period.[3]  (Neal Decl. ¶ 17(b), Ex. N.)  Several other public filings contained similar

misrepresentations about customers and revenue.

C.      Metter, Moskowitz, and Spongetech Vastly Understated Spongetech's
         Outstanding Shares

Defendants Metter, Moskowitz, and Spongetech also made public statements vastly

understating the number of Spongetech's outstanding shares.  For example, in a February 2,

2009, press release, Metter announced that Spongetech had decreased its issued and outstanding

shares "by approximately 29%," leaving 700,000,000 shares of Spongetech stock issued and

outstanding.  (Davis Decl. ¶ 26, Ex. R.)  However, transfer agent records show that the actual

---

[3]      Metter and Moskowitz each signed Sarbanes-Oxley certifications and certified, among
other things, that based on their knowledge, the reports did not contain any untrue statements of
material fact or omit to state a material fact necessary to make the statements made, in light of
the circumstances under which such statements were made, not misleading with respect to the
periods covered by the reports and that, based on their knowledge, that information contained in
the reports fairly presented, in all material respects, the financial condition and results of
Spongetech's operations.  (Neal Decl. ¶ 8.)

number of outstanding shares was 1,240,355,602. (Davis Decl. ¶ 26, Ex. Q.) Similarly,

Spongetech's quarterly report for the quarter ending February 28, 2009, states that Spongetech

had 722,866,061 shares of common stock issued and outstanding as of April 16, 2009. (Davis

Decl. ¶ 26, Ex. G.) In fact, Spongetech had 1,621,866,461 shares of common stock issued and

outstanding as of that date – a discrepancy of nearly 900 million shares. (Davis Decl. ¶ 26, Ex.

Q.) Rather than decreasing the number of Spongetech's outstanding shares, the defendants were

rapidly escalating it.

## II.        Defendant Speranza Created Websites And Virtual Offices For The Fictitious Customers

In September 2009, in response to public and SEC inquiries about Spongetech's

customers, Defendant Speranza, a stock promoter who runs the website "nohypenobull.com,"

(Neal Decl. ¶ 38(a), Ex. SS at 33, 47-54), created websites and virtual office space for

Spongetech's fictitious customers. (Neal Decl. ¶¶ 26-34, 39-43.) At around the same time, RM

Enterprises paid Speranza approximately $15,000; RM Enterprises paid Speranza $10,000 on

September 1, 2009, and another $5,000 on September 16, 2009. (Neal Decl. ¶ 47(e), Exs. NN &

OO.) In or around October 30, 2009, when SEC staff questioned Speranza about his conduct, he

denied being paid for his services. (Neal Decl. ¶ 47(e), Ex. SS at 65, 70, 73, 109, 112, 180.)

Speranza maintained the websites and forwarded all emails sent to the websites to his

own email account. (Neal Decl. ¶ 47(d)(ii-iii), Ex. SS at 88-89, 98, 193.) On September 10,

2009, Speranza registered the domain names of each website with Domains By Proxy, Inc., a

private registration service that prevents access to the personal identifying information of the

registrant. (Neal Decl. ¶ 42, Ex. GG.) Later the same month, Speranza went even further and

arranged for physical office space for the fictitious customers after the public tried to contact

them through the websites.  In his application for their temporary space, Speranza provided fictitious names of contact persons.  (Neal Decl. ¶ 47(a), Ex. SS at 94, 102-104.)

In his testimony before SEC staff, Speranza insisted that he would continue to maintain the websites.  (Neal Decl. ¶ 47(d)(iii), Ex. SS at 98, 193.)  SEC staff checked the websites on May 8, 2010, after the SEC filed its complaint, and the websites were no longer in place.  (Neal Decl. ¶ 47(d)(iii).)

### III.   Metter, Moskowitz, and Spongetech Used RM Enterprises And Others As Conduits To Distribute Restricted Spongetech Shares To The Public In Unregistered Transactions

After inflating the value of Spongetech shares, Metter, Moskowitz, and Spongetech distributed them illegally through unregistered transactions to the public market.  First, they illegally distributed Spongetech shares in unregistered transactions to RM Enterprises and other affiliated entities, which, in turn, acted as conduits to further distribute the shares.  (Davis Decl. ¶¶ 27, 35.)

Spongetech issued millions of restricted shares in private placements to RM Enterprises and other affiliated entities in numerous illegal transactions, which amounted to a single, continuous, unregistered transaction.  Although Spongetech claimed an exemption and safe harbor under Section 4(2) of the Securities Act and Rule 506 of Regulation D for the offer and sales to RM Enterprises and the other affiliates, these provisions did not apply.  Both require the issuer to exercise reasonable care to assure that the securities are purchased for investment and not with a view to public distribution.  Securities Act of 1933, Rule 506 [15 U.S.C. § 77d(2)]. Spongetech issued the restricted shares for the very purpose of publicly distributing them by funneling them through RM Enterprises and other affiliates as conduits.  The transactions thus were neither registered, nor subject to valid exemptions or safe harbors.

9

**IV.    Defendants Pensley And Halperin Rendered Baseless Attorney Opinion Letters**

To funnel the shares through RM Enterprises and other affiliates to the public market, Metter, Moskowitz, Spongetech, and RM Enterprises used attorney opinion letters prepared by Defendants Pensley and Halperin.   After receiving the baseless attorney opinion letters, Spongetech's transfer agent improperly removed restrictive legends from the restricted shares. (Davis Decl. ¶ 29, 33, 39.)   This allowed RM Enterprises and other affiliates to distribute the shares illegally in the public market in unregistered transactions.

A.    Pensley

Between on or about March 15, 2007, and June 19, 2007, Pensley prepared at least four attorney opinion letters, which were sent to Spongetech's then-transfer agent, Olde Monmouth, which then improperly removed restrictive legends from approximately 12 million restricted shares. (Davis Decl. ¶ 29, Exs. V & W.)   In each of the four opinion letters, Pensley falsely represented that RM Enterprises, as the parent of Spongetech, was "spinning-off" shares of Spongetech to RM Enterprises' shareholders. (Davis Decl. ¶ 31, Ex. V.)   Pensley transmitted the letters to the transfer agent who then improperly removed restrictive legends from the shares for subsequent public distribution.[4]   Pensley, who in 1998 was enjoined from future violations of the general antifraud and registration provisions of the federal securities laws and was suspended pursuant to Rule 102(e) of the SEC's Rules of Practice, *SEC v. DiMauro*, et al, No. 98-Civ. 6349 (LAP) (S.D.N.Y. Sept. 9, 1998), knew or was reckless in not knowing when he rendered the

---

[4]    Stock may be distributed in an unregistered spin-off transaction if certain conditions in Staff Legal Bulletin No. 4 are met.  Among other things, the shares distributed by a parent company in the spin-off must have been held for at least two years; the spin-off must be for a valid business purpose; the shares must be spun-off *pro rata* to the parent's shareholders; the parent shareholders may not provide consideration for the "spun-off" shares; and the distribution may not be for value.  SEC Staff Legal Bulletin No. 4., Sep. 16, 1997, *available at* http://www.sec.gov/interps/legal/slbcf4.txt.

opinions that Staff Legal Bulletin No. 4 did not apply to the transactions and that there was no proper basis to remove the restrictive legends from Spongetech's stock.

For example, in each letter he transmitted to the transfer agent, Pensley opined that RM Enterprises was "spinning" off shares for a valid business purpose; that RM Enterprises was doing so *pro rata* to RM Enterprises' shareholders; and that RM Enterprises and was not doing so for value. (Davis Decl. ¶ 31, Ex. V.) Pensley, however, knew, or was reckless in not knowing, that RM Enterprises was issuing the shares for consideration and that the shares were not being "spun off" *pro rata* to RM Enterprises shareholders. Pensley himself received shares in these transactions that appear to be *compensation* for his services,[5] (Davis Decl. ¶¶ 31-32, Ex. V), and he did not know the ratio of his own shares, (Davis Decl. ¶ 32, Ex. Z at 219-220.) Moreover, Pensley admitted that he did not know whether all of the beneficiaries of the attorney opinion letters were RM shareholders, (*Id.* at 219-220, 279.) Pensley also falsely opined that RM Enterprises had valid business purposes for the issuances, when he knew, or was reckless in not knowing, that this representation was untrue. (*Id.* at 274.) Pensley also admitted that he had not conducted any due diligence before rendering his opinion except talking to Moskowitz. (*Id.* at 219-223).)

After he issued the letters, Pensley also made misrepresentations to SEC staff. In his November 6, 2009 testimony, Pensley stated that he had received approximately 400,000 Spongetech shares between 1999 and 2007; that he had not received any Spongetech shares after 2007; and that he had sold the remainder of his Spongetech stock "years ago," (Davis Decl. ¶ 32,

---

[5]     Pensley testified that he prepared the attorney opinion letters without compensation, and he suggested that he received the Spongetech shares as compensation for past services. (Davis Ex. Z (Tr. 96-97, 178-80).)  Earlier in the same testimony, Pensley testified that, when he previously performed services as Spongetech's corporate counsel, he was typically compensated in stock. (Davis Ex. Z (Tr. 55).)

Ex. Z at 55, 79-80.) In fact, transfer agent records reveal that Pensley received over 2 million Spongetech shares between December 9, 2002, and April 22, 2008, and that Pensley sold the shares in the public market in several transactions between April 30, 2007, and April 3, 2009. (Davis Decl. ¶ 32, Exs. Z & AA.)

      B.    <u>Halperin</u>

Between June 2009 and approximately September 29, 2009, Halperin issued ninety-two baseless opinion letters, which were sent to Spongetech's new transfer agent, WorldWide Stock. WorldWide Stock improperly removed restrictive legends from over 922 million Spongetech shares held by RM Enterprises. (Complaint ¶¶ 91-98.) Relying on the Rule 144 safe harbor, Halperin knowingly or recklessly opined that restricted Spongetech shares satisfied the six-month holding period required under the rule when in fact Spongetech had issued the vast majority of the shares to RM Enterprises fewer than six months before the restrictive legends were removed. (Davis Decl. ¶ 34, Ex. T.) On or about June 24, 2009, for example, WorldWide Stock issued 34,000,000 restricted Spongetech shares to RM Enterprises the *same day* that Moskowitz used Halperin's opinion letter to instruct WorldWide to remove the restricted legends from the share certificate and transfer the shares. (*Id.*, Exs. BB & CC.)

Spongetech purported to issue the restricted shares to RM Enterprises in repayment of approximately thirty-five purported loans that RM Enterprises had made to Spongetech between December 31, 2007, and March 17, 2008. Under certain circumstances where stock is issued to repay a loan, the holding period for the stock can be measured in reference to the date the loan is disbursed. Halperin knew, or was reckless in not knowing, that these loans were shams. Among other things, the loans were not reflected on Spongetech's public filings, which Halperin had reviewed. (Davis Decl. ¶ 34, Ex. DD at 74, 75, 84.) He also knew, or was reckless in not

12

knowing, that there was no other legitimate basis for removing the restrictive legends from the shares.

Halperin also issued nineteen letters after August 31, 2009, in which it was necessary for the public to have "adequate current information" available about Spongetech for a safe harbor under Rule 144 of the Securities Act of 1933 to apply.[6] Rule 144(c). The letters were transmitted to WorldWide Stock, which improperly removed restrictive legends from 165,963,360 restricted Spongetech shares for 29 beneficiaries. As Halperin knew, or was reckless in not knowing, Spongetech had not filed its annual report for the year ended May 31, 2009, or issued any financial statements since its last Commission filing, in April 2009, and the public clearly did not have "adequate current public information" about Spongetech. (Davis Decl. ¶ 12, Ex. H.)

Moreover, during the three month period from June 23, 2009 to August 21, 2009, RM Enterprises sold approximately 518 million shares using Rule 144 letters from Halperin. (Davis Decl. ¶ 33, Ex. T.) Under Rule 144, only one percent of outstanding shares as shown by the issuer's most recent report can be sold in reliance on the Rule. Rule 144(e). The shares sold pursuant to the Halperin letters alone amount to approximately 71% of the 722,866,061 then outstanding shares as last published by Spongetech in its Form 10-Q filed on April 20, 2009.

---

[6]     Rule 144 of the Securities Act of 1933 provides a safe harbor permitting the public resale or transfer of restricted securities in the absence of a registration statement where the seller or transferor of securities has held the securities for a minimum of six months before the resale or transfer. Rule 144(d). Further, if the resale or transfer is conducted during the first year of the holding period for non-affiliates, "adequate current public information" about the issuer must be available at the time of the transaction, which means that the issuer must be current in certain of its public filings. Rule 144(c). If the reseller is an affiliate, adequate public information must be available at the time of the transaction regardless of how much time has elapsed from the initial purchase. *Id.*

(Davis Decl. ¶ 33, Ex. G.)  As Halperin knew, or was reckless in not knowing, this was far more than the 1% trading volume permitted under Rule 144.  Rule 144(e).

**V.      Spongetech Shares Continue To Trade In The Grey Market**

On October 5, 2009, the SEC temporarily suspended trading on Spongetech's shares after questions arose regarding the accuracy of assertions in press releases to investors and in periodic reports filed with the SEC concerning, among other things: (1) the amount of sales and customer orders Spongetech received; (2) Spongetech's investment agreements; and (3) Spongetech's revenues as reported in its financial statements.  The order also stated that Spongetech had not filed any periodic reports with the Commission since the period ended February 28, 2009. (Davis Decl. ¶ 5, Ex. A; Glascoe Decl. ¶ 3.)  Since that time, Spongetech shares have traded at high volumes on the grey market.  (Glascoe Decl. ¶¶ 5, 14.)

Metter, Moskowitz, and Spongetech continue to aggressively tout Spongetech's Spongetech's performance.  As recently as April 2010, for example, Spongetech issued a press release, quoting Moskowitz, claiming that the market for Spongetech products was rapidly expanding and now included over 45,000 retail locations in North America.  In or about April 22, 2010, Spongetech, Metter and Moskowitz sued the *New York Post*, a *New York Post* reporter and others alleging, among other things, that there was a conspiracy to depress the stock of Spongetech shares; and that the defendants had libeled and defamed Spongetech, Metter, and Moskowitz based on, among other things, newspaper articles that questioned Spongetech's public representations about its business, customers, and outstanding shares.   *See* Complaint, *Spongetech Delivery Systems, Inc., et al. v. NYP Holdings, Inc., et al.*, (New York Sup. Ct. 2010) (Index No. 10601047).   Moreover, as described above, the day before the SEC filed its complaint, on May 4, 2010, Moskowitz told the *New York Times* that Spongetech's profit claims

14

would be "vindicated" and that Spongetech "had 723 million shares outstanding, just as it had reported" in its financial statement.

In total, Spongetech, RM Enterprises, Metter, and Moskowitz have directly, or indirectly, profited in the millions of dollars from the scheme.

## ARGUMENT

## I.  THE COURT SHOULD ENTER A PRELIMINARY INJUNCTION RESTRAINING THE DEFENDANTS FROM VIOLATING THE SECURITIES LAWS.

### A.  The Standard For Emergency Relief.

On a showing that a person has engaged or is about to engage in a violation of the Securities Exchange Act of 1934 (the "Exchange Act"), "a permanent or temporary injunction or restraining order shall be granted without bond." Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1). In seeking a preliminary injunction, the SEC approaches the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir. 1975).[7] Therefore, the SEC's burden is lower than that of a private party. In particular, the SEC is not required to show a risk of irreparable injury, a balance of equities in its favor, or unavailability of remedies at law. Rather, "[a] preliminary injunction enjoining violations of the securities laws is appropriate if the SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh,* 155 F.3d 129, 132 (2nd Cir. 1998); *SEC v. Unifund SAL,* 910 F.2d 1028, 1036-37 (2d Cir. 1990); *SEC v. Unique*

---

[7]     In considering SEC applications for temporary restraining orders and preliminary injunctions, the Second Circuit has emphasized the "need to enforce the securities laws." *SEC v. Management Dynamics, Inc.,* 515 F.2d at 809 n.5. As the Supreme Court reasoned in connection with a similar regulatory statute, "the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases." *Hecht Co. v. Bowles,* 321 U.S. 321, 331 (1944).

*Financial Concepts, Inc.*, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999) (requiring the Commission to present a *prima facie* case that the Defendant has violated the law, and that there is a reasonable likelihood of repetition). As shown in the facts set forth above, the Commission is able to demonstrate that the Defendants have violated the securities laws, and will continue to violate them if not immediately enjoined from his securities activities.[8]

### B.  The Defendants Are Engaged In Violations Of The Securities Laws.

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 make it unlawful to use fraudulent practices and misrepresentations or omissions in connection with the offer, sale or purchase of any security.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  To establish a violation of Sections 17(a) of the Securities Act and 10(b) of the Exchange Act and Exchange Act Rule 10b-5, the SEC must show that a defendant:  (1) made a misrepresentation or omission of material fact;[9] (2) in connection with the sale or purchase of a security (Section 10(b)) or in the offer or sale of a security (Section 17(a)); (3) with scienter.  *See Basic v. Levinson*, 485 U.S. 224, 235 n. 13 (1988).  Although Sections 10(b) and 17(a) have virtually identical requirements, the SEC does not have to show scienter to establish violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.  *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980).

---

[8]     In determining whether a preliminary injunction is warranted, the Court may rely upon affidavits and hearsay materials regardless whether they would be admissible at a trial on the merits.  *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).  Moreover, affidavits may be considered at the preliminary injunction stage even if they do not meet the strict rules for consideration on a motion for summary judgment.  *Kos Pharmaceuticals*, 369 F.3d at 718-19.

[9]     The SEC has also alleged that Spongetech, Metter, Moskowitz, and RM Enterprises employed devices, scheme or artifices to defraud and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others, in violation of Exchange Act Section 10(b) and Rule 10b-5.  (*See* Complaint ¶¶ 115-116.)

The purpose of the registration requirements of Section 5 of the Securities Act is to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953). Section 5 prohibits any person from directly or indirectly using the means of interstate commerce to sell or offer to sell a security unless a registration statement is in effect. See 15 U.S.C. §§ 7e(a), (c). In short, under the Securities Act, any sale of a security must either be registered or exempt, and, if not, it violates Section 5.

The SEC makes a *prima facie* case of a Section 5 violation by showing that (1) no registration statement was filed or in effect at the time of the sale; (2) the defendant, directly or indirectly, sold or offered to sell the securities; and (3) interstate means were used in connection with the offer or sale. *See SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007). Section 5 liability extends to those who were "necessary participants" and "substantial factors" in the unregistered offering. *See Universal Exp., Inc.*, 475 F. Supp. 2d at 422; *SEC v. Phan*, 500 F.3d 895, 906 n. 13 (9th Cir. 2007). Scienter is not an element of a Section 5 claim. *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1046-47 (2d Cir. 1976); *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004).

1.    Defendants Violated The Antifraud Provisions

As demonstrated above, the Defendants violated the general antifraud provisions of the federal securities laws. Metter, Moskowitz, and Spongetech made repeatedly materially false or misleading statements in multiple press releases and SEC public filings to inflate the value of Spongetech shares. Metter and Moskowitz not only signed public filings and reviewed and approved the press releases, but the press releases often directly quoted them making misleading statements. Metter, Moskowitz, and Spongetech wildly exaggerated Spongetech's customer

17

base, orders, and revenue, while massively understating Spongetech's outstanding shares. Not only does the evidence show that they created fictitious customers, to which they attributed the bulk of Spongetech's business, but Spongetech's own bank records make clear that the orders they touted did not take place.

These misrepresentations were neither immaterial nor accidental. The five fictitious customers, and the business they purportedly generated, were the centerpiece of Spongetech's publicly reported prospects. As just one example, in Spongetech's Form 10-Q for the period ending February 28, 2009, which Moskowitz and Metter signed, Spongetech, Metter, and Moskowitz touted over $30 million in revenue. In that period, virtually all of Spongetech's sales were attributable to non-existent orders from non-existent customers. (Neal Decl. ¶ 8, Ex. B.) Moskowitz also claimed to have *spoken to* the contact persons for the fictitious customers, Jim Rogers, Helen Simms, Ahmed Elsayed, and Steven Chin, (Neal Decl. ¶ 48, Ex. SS at 403-415), and Metter claimed to have met Elsayed, when in fact Speranza admitted that he made those names up. (Neal Decl. ¶ 49, Ex. SS at 272-273.) Moreover, as discussed above, Metter, Moskowitz, and Spongetech have continued to issue press releases touting Spongetech's performance even after the SEC temporarily suspended Spongetech trading in October 2009 based on concerns about the accuracy of Spongetech's public statements, and even as SEC staff has continued to investigate their representations. The day before the SEC filed its complaint, Moskowitz reiterated to the *New York Times* the accuracy of Spongetech's claims as to profit and share numbers.

Defendant Speranza materially misrepresented the existence of Spongetech's fictitious customers by creating websites, setting up virtual offices, renting temporary office space for them, and inventing business persons. These misrepresentations were material because they not

only concealed the fraud, but they gave the fictitious customers, and therefore Spongetech, an appearance of legitimacy. The timing and circumstances of Speranza's actions also demonstrate that he acted knowingly or recklessly. Speranza acted because the public had raised questions about Spongetech and its customers, and he did so near the time that SEC staff and Spongetech's auditor asked Spongetech for customer contact information. Speranza then went even further and arranged for physical office space for the fictitious customers after the public tried to contact them through the websites. Speranza also has not been candid about his role in the fraud. When he testified before SEC staff, Speranza denied receiving payment for his services even though bank records show that RM Enterprises paid him at least twice within days of his conduct. (Neal Decl. ¶ 47(e), Ex. NN & OO.)

Similarly, Pensley and Halperin rendered opinion letters resulting in the improper removal of restrictive legends from approximately 2.5 billion Spongetech shares. As discussed above, their opinion letters included materially false or misleading statements.

2.      Defendants Violated The Registration Provisions

The evidence described above also establishes that Metter, Moskowitz, Pensley, Halperin, Spongetech, and RM Enterprises violated the registration provisions of the Securities Act. Spongetech distributed millions of shares in transactions through RM Enterprises and other affiliates for which there was no registration statement. Moskowitz, Metter, Pensley, and Halperin were necessary participants and substantial factors in the unregistered offerings and thus at a minimum were indirect sellers of the unregistered and non-exempt shares. In addition, Moskowitz and Metter both controlled Spongetech and RM Enterprises, which improperly distributed Spongetech shares to other entities controlled by, or closely affiliated with, Spongetech management. Pensley and Halperin rendered fraudulent opinions that were sent to

19

Spongetech's transfer agents, who improperly removed restrictive legends from Spongetech shares for subsequent distribution in the public market.  In short, without each of their efforts, the illegal distribution of Spongetech shares in unregistered transactions would have been impossible.

### 3.    Spongetech Violated the Books and Records Provisions

As discussed above, Defendant Spongetech failed to file periodic reports with the SEC, and included materially false or misleading information in the reports it did file with respect to its customers, sales, revenues, orders, and outstanding shares.  Moreover, Spongetech produced purchase orders in response to SEC staff inquiries which, on their face, contain materially false information such as the names of customer contact persons that Speranza invented, and customer addresses that reflect ports, and an airport terminal, rather than actual customer business addresses.  (Neal Decl. ¶¶ 50-53, Ex. PP.)  Spongetech, Metter, and Moskowitz thus failed to maintain accurate books and records and devise and maintain a system of internal accounting controls and have violated, and unless enjoined will continue to violate, Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act, and Exchange Act Rules 12b-20, 13a-13 and 15d-1, 15d-11, and 15d-13.

### C.    **The Defendants Are Likely To Commit Future Violations**

The SEC also must establish a substantial likelihood that, unless restrained, the defendants will continue infringing the securities laws.  *Cavanagh,* 155 F.3d at 135.  "Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations."  *Management Dynamics, Inc.,* 515 F.2d at 807; *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972) (past illegal conduct "gives rise to an inference of a reasonable expectation of continued violations").  To assess the likelihood of future violations,

factors can include: the egregiousness and character of the violation; the degree of scienter involved, the isolated or repeated nature of the violations; the defendant's recognition of the wrongful nature of his conduct; and the degree to which a defendant's occupation or activities might present future opportunities to violate the law. *See, e.g., Cavanagh,* 155 F.3d at 135; *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100-01 (2d Cir. 1978).

The Defendants' securities violations were egregious and entailed a high degree of scienter. Beginning in April 2007, Moskowitz and Metter repeatedly and wildly exaggerated Spongetech's performance in numerous public statements in order to inflate the price of Spongetech's shares. They fabricated their primary customer base the existence of which they cited as accounting for as much as 99.4% of Spongetech's purported sales in the quarter ended February 28, 2009. They also continue to issue misleading press releases even after the SEC temporarily suspended trading on Spongetech shares based on concerns about the accuracy of Spongetech's public statements, and even as SEC staff has continued to investigate their conduct. Moreover, Metter is a former registered representative with an extensive disciplinary history including ten customer complaints, one internal review, and a termination.

Speranza not only created websites and virtual offices for non-existent customers, but he went a step further by establishing physical office space in order to make the customers seem more real. He also fabricated fictitious names of contact persons for each entity when he applied for the temporary office space. (Neal Decl. ¶ 47(a), Ex. SS at 94, 102-104.) In addition, he denied being paid for his services even though RM Enterprises paid him twice around the time he established the virtual storefronts. (Neal Decl. ¶ 47(e), Ex. NN & OO.)

Defendants Pensley and Halperin repeatedly rendered fraudulent attorney opinion letters in connection with the massive illegal distribution of restricted Spongetech shares in unregistered

transactions. Halperin, who issued nearly 100 fraudulent opinion letters, was essentially an attorney opinion "mill" for Metter, Moskowitz, Spongetech, and RM Enterprises. Pensley rendered fewer opinions, but his actions resulted in the improper removal of restrictive legends from approximately 12 million restricted Spongetech shares. Moreover, as previously described, Pensley is a recidivist, having previously been enjoined in 1998 from future violations of the registration and general antifraud provisions of the federal securities laws. *SEC v. DiMauro, et al*, No. 98 Civ. 6349 (LAP) (S.D.N.Y. filed Sept. 9, 1998).[10]

In short, the Defendants acted repeatedly and consistently through numerous press releases, public filings, fraudulent opinion letters, and unregistered transactions. The recurring and persistent nature of the violations makes it likely that the Defendants will, without an injunction, commit future violations. *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996).

## II.    THE COURT SHOULD FREEZE THE ASSETS OF DEFENDANTS METTER, MOSKOWITZ, SPONGETECH, AND RM ENTERPRISES.

The SEC requests that the Court impose a freeze on the assets of defendants Spongetech, RM Enterprises, Moskowitz, and Metter to ensure that the investors' money is preserved pending final judgment. The Second Circuit has recognized that "there may be circumstances where a district court should temporarily freeze defendants' assets to insure that they will be available to compensate public investors." *Manor Nursing Centers, Inc.*, 458 F.2d at 1106. An asset freeze requires a lesser showing than that required for a preliminary injunction enjoining violations of the securities laws. *Cavanagh*, 155 F.3d at 132; *SEC v. Heden*, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999). In particular, the SEC "must establish only that it is likely to succeed on the

---

[10]    On January 7, 1999, based on the entry of this injunction, the SEC issued an administrative order pursuant to Rule 102(e) denying him the privilege of practicing or appearing before the Commission, with the right to reapply after three years. *In the Matter of Joel Pensley*, Rel. No. 34-40890 (January 7, 1999).

merits." *Cavanagh*, 155 F.3d at 132.[11]  The SEC is not required to show a risk of irreparable

injury.  *Id.*

Here, it is much more than likely that the SEC will succeed on the merits.  The vast

majority of Spongetech's purported business was a sham, and there is an undeniable disconnect

between the public statements and the reality of Spongetech's business.  The evidence

demonstrates that Defendants Spongetech, Moskowitz, and Metter made unequivocal, and wildly

exaggerated, representations about Spongetech's orders, customers, revenue, and prospects.

Moreover, they used these falsehoods to pump up Spongetech stock as part of a scheme to dump

the shares on the public for profit in unregistered transactions.  Spongetech, RM Enterprises,

Moskowitz, and Metter profited, directly or indirectly, in the millions of dollars from this

scheme.

## III.   THE COURT SHOULD ORDER AN ACCOUNTING AND FORBID THE DESTRUCTION OF EVIDENCE.

An accounting by all Defendants will be an important step in enabling the Court to

preserve investors' money pending final judgment.  The Court should order that all Defendants

prepare a sworn accounting of all the money they have obtained from Spongetech orders; sales

of Spongetech shares; and funds distributed between and among Spongetech, RM Enterprises,

and other affiliated entities, including (1) a report on the disposition and current location of the

money, and (2) disclosure of all bank and brokerage account numbers where they deposit money.

Defendants also should be required to identify all assets that they own or control, and which are

traceable to them, regardless of whether those assets are in Spongetech's name.  To protect the

---

[11]     Courts issue freezes in SEC enforcement actions to preserve assets for several reasons, including for disgorgement of illegal profits from securities transactions; for payment of civil money penalties; and (3) for payment of prejudgment interest.  A freeze order can operate as to assets that are not traceable to the illegal activity, *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995), *aff'd sub nom. SEC v. Estate of Hirschberg*, 101 F.3d 109 (2d Cir. 1996).

books and records showing the location of assets and the disposition of funds, the Court should also prohibit Defendants from altering or destroying documents.

## CONCLUSION

Wherefore, the Commission requests that the Court enter a preliminary injunction:

a)  preliminarily enjoining Defendant Spongetech from violating Sections 5(a), 5(c) and 17(a) of the Securities Act  [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)], and 78o(d), and Exchange Act Rules 10b-5, 12b-20, 13a-13 and 15d-1, 15d-11, and 15d-13 [17 C.F.R. §§ 240.10b-5, 12b-20, 13a-1 & 13a-13, 15d-1, 15d-11, and 15d-13];

b)  preliminarily enjoining Defendant RM Enterprises from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

c)  preliminarily enjoining Defendant Moskowitz from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, Exchange Act Rules 10b-5, 13b2-1, 13b2-2, and 15d-14, and Section 304 of the Sarbanes-Oxley Act of 2002, from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act and Exchange Act Rules 12b-20, 13a-13, 15d-1, 15d-11, and 15d-13;

d)  preliminarily enjoining Defendant Metter from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, Exchange Act Rules 10b-5, 13b2-1, 13b2-2, and 15d-14, and Section 304 of the Sarbanes-Oxley Act of 2002, from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act and Exchange Act Rules 12b-20, 13a-13, 15d-1, 15d-11, and 15d-13;

e)  preliminarily enjoining Defendant Speranza from violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, and from aiding and abetting violations of Sections 10(b) of the Exchange Act and Exchange Act Rule 10b-5;

f)  preliminarily enjoining Defendants Pensley and Halperin from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5;

g) ordering that Defendants Spongetech, RM Enterprises, Metter, Moskowitz, Speranza, Pensley, and Halperin provide an accounting of monies and shares of Spongetech stock that they received and the disposition of such monies and stock prohibit from altering or destroying documents;

h) prohibiting Defendants Spongetech, RM Enterprises, Metter, Moskowitz, Speranza, Pensley, and Halperin from altering or destroying documents;

i) prohibiting Defendant Metter, Moskowitz, Speranza, Pensley, and Halperin from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

j) preliminarily freezing the assets of Spongetech, RM Enterprises, Metter, and Moskowitz to retain such assets for distributions to the victims of the scheme;

k) preliminarily bar Pensley and Halperin from providing professional services to any person or entity in connection with the offer or sale or securities, including but not limited to, participating in the preparation or issuance of any attorney opinion letter related to such offerings; and

l) grant such other relief as this Court may deem just and proper.

A proposed order has been submitted.


Dated:  Washington, D.C.
        May 14, 2010

                                          Respectfully submitted,

Of Counsel:                               _Richard E. Simpson_

        Christopher Conte                 Richard E. Simpson
        Charles Cain                      100 F Street N.E.
        Jeffrey T. Tao                    Washington, D.C.  20549-4030
        Christine Neal                    202-551-4492
        Uta von Eckartsberg               202-772- 9245 (FAX)
        Charles Davis                     simpsonr@sec.gov
        Amybeth Garcia-Bokor              Attorneys for Plaintiff
                                          Securities and Exchange Commission

25