UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> SPONGETECH DELIVERY SYSTEMS, INC.; RM ENTERPRISES INTERNATIONAL, INC.; STEVEN Y. MOSKOWITZ; MICHAEL E. METTER; GEORGE SPERANZA; JOEL PENSLEY; and JACK HALPERIN, <br><br> Defendants. | Civil Action No. 10-CV-2031 |

## DECLARATION OF CHARLES C. DAVIS, JR.

I, Charles C. Davis, Jr., pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney in the Division of Enforcement of the United States Securities and Exchange Commission (the "SEC" or the "Commission"). I am a member in good standing of the District of Columbia Bar. As part of my daily activities as a member of the Commission staff, I investigate possible violations of the securities laws.

2. I submit this Declaration in support of the SEC's Motion for Preliminary Injunction, Asset Freeze, and Other Relief.

3. On September 2, 2009, the SEC's Division of Enforcement commenced this formal investigation concerning possible violations of the federal securities laws

by Spongetech Delivery Systems, Inc, ("Spongetech"), which investigation is on-going. During the course of this investigation, I have been an attorney working on the matter. The facts set forth herein are based upon my personal knowledge or upon information contained in the files of the Commission.

4. I have reviewed Spongetech's corporate records which show Spongetech is a Delaware corporation with its principal place of business located in New York, New York. Steven Y. Moskowitz ("Moskowitz") is Spongetech's Chief Operating Officer, Chief Accounting Officer, and Secretary, and a member of its Board of Directors. Michael L. Metter ("Metter") is Spongetech's President and Chief Executive Officer, and a member of its Board of Directors. Spongetech purports to design, produce and distribute cleaning products in the form of biodegradable sponges embedded with soap.

5. From 2006 until October 5, 2009, when the Commission issued a trading suspension, Spongetech's common stock was quoted on the OTC Bulletin Board. Since the trading suspension, Spongetech's common stock continues to be traded on an unsolicited basis. (See Exhibit A annexed)

6. I have reviewed Spongetech corporate records and public filings, which show that from Spongetech's inception in 1999 through approximately May 31, 2007, the end of its 2007 fiscal year, the bulk of Spongetech's product sales was attributable to a single customer. (See Exhibit B annexed).

7. Beginning in approximately April 2007, Spongetech and its principals began to make public statements that the fledgling company was finally taking off, pointing to millions of dollars in orders it claimed to have received from an entity

2

8. that would distribute its product in South America called, variously, "SA Trading Group Corp.," "SA Trading," or "SA Trading Company" (hereinafter "SA Trading"). (See Exhibit C annexed).

8. In 2008, Spongetech issued press releases claiming product sales to three large foreign customers: SA Trading, US Asia Distribution (also described as the "Asian Distribution Company of USA") (hereinafter "US Asia"), and Dubai Export Import Company (hereinafter "Dubai"). (See Exhibit D annexed).

9. In its Form 10-KSB for the fiscal year ending May 31, 2008, filed with the Commission on August 29, 2008, Spongetech stated that orders from SA Trading, US Asia and Dubai constituted 70% of its reported revenue. (See Exhibit E annexed).

10. Throughout 2009, the Company continued to issue press releases claiming increasing sales, including a press release on September 1, 2009 claiming $70 million in orders for the quarterly period ended August 31, 2009. (See Exhibit F annexed).

11. In Spongetech's last public filing on Form 10-Q for the quarterly period ended February 28, 2009, filed with the Commission on April 20, 2009, Spongetech reported revenue in excess of $30 million and stated that 99.4% of its product sales were attributable to six customers: SA Trading, Dubai, US Asia, Fesco Sales Corp (hereinafter "Fesco"), New Century Media (hereinafter "New Century") and Walgreens. (See Exhibit G annexed). While the consignment sales to Walgreens, totaling approximately $200,000, have been confirmed, no sales to the other five customers can be confirmed.

12. Spongetech has not filed financial statements since April 20, 2009, when it filed the above-referenced Form 10-Q. (See Exhibit H annexed).

13. Using contact information, provided to the investigative staff by Spongetech's principals and its then counsel, the staff was unable to verify the existence of the five alleged foreign customer companies. The investigative subpoenas sent to those companies were delivered to what turned out to be virtual offices that had recently been set up by a Spongetech consultant, George Speranza ("Speranza"), a defendant in this action.

### Spongetech's Corporate Banking Records Do Not Support Its Claim of Sales to Foreign Customers

14. In response to the staff's subpoena, Spongetech identified only a single corporate banking account held at Commerce Bank, now TD Bank (account number xxxxxx0121). On October 16, 2009, I subpoenaed Spongetech's banking records from the bank for that account. (See Exhibit I annexed). TD Bank delivered responsive documents including account opening documents, monthly account statements, debit and credit detail including photocopies of checks drawn on the account, as well as detail of wire transfers into and from that Spongetech account, for the period from November 2007 through October 2009. After a thorough review of those banking records, combing for evidence of, among other things, any transaction involving any of the reported five large foreign customers, I found no transactions, no credits, no deposits, no drafts, no checks, and no wire transfers into Spongetech's account from any of the five foreign entities that Spongetech claimed as customers of its products. Spongetech received no income from any of those alleged foreign customers.

4

15. Spongetech's public statements in the press and in its public filings with the Commission claiming revenue or income from products sales to SA Trading, US Asia, Dubai, Fesco, and New Century are not supported by its corporate banking records, as there is no evidence in its corporate banking records of income or payments or credits or wire transfers from any of those alleged customers.

16. The cash flows in and out of Spongetech's account are insufficient to support its public sales and revenue claims. The cash flow chart below, which I compiled from the monthly account statements produced by the bank, reflects the cash flow in and out of Spongetech's bank account, and month-end balances, for an eighteen month period from April 2008 through September 2009. (See Exhibit J annexed). The first column of figures is the combined deposits and credits; the second column of figures is the combined checks and debits; and the final column is the month-end cash balance.

| Date | Deposits & Credits | Checks & Debits | Month-end Balance |
|---|---|---|---|
| Apr-08 | $323,914.34 | $291,201.75 | $78,646.94 |
| May-08 | $705,317.37 | $425,125.99 | $358,838.32 |
| Jun-08 | $737,493.79 | $918,810.09 | $177,522.02 |
| Jul-08 | $232,310.81 | $388,521.37 | $21,311.46 |
| Aug-08 | $1,126,309.28 | $932,069.67 | $215,551.07 |
| Sep-08 | $618,739.44 | $872,203.41 | $25,087.10 |
| Oct-08 | $240,065.51 | $237,419.97 | $27,732.64 |
| Nov-08 | $279,872.03 | $298,388.77 | $9,190.90 |
| Dec-08 | $502,038.87 | $476,629.34 | $34,600.43 |
| Jan-09 | $572,997.48 | $603,089.40 | $4,483.51 |

| | | | |
|---|---|---|---|
| Feb-09 | $382,868.67 | $367,818.34 | $19,508.84 |
| Mar-09 | $397,672.83 | $426,626.37 | ($9,469.70) |
| Apr-09 | $1,415,725.63 | $1,364,827.46 | $41,403.47 |
| May-09 | $1,616,544.03 | $1,444,729.26 | $213,193.24 |
| Jun-09 | $2,224,933.05 | $2,245,897.32 | $192,228.97 |
| Jul-09 | $9,174,932.51 | $8,457,289.57 | $909,846.91 |
| Aug-09 | $4,510,108.24 | $3,788,898.77 | $1,631,056.38 |
| Sep-09 | $2,458,758.92 | $3,756,808.69 | $333,005.98 |

17. I have reviewed the transaction detail of Spongetech's corporate bank account. The bulk of the cash funds coming into Spongetech's bank account comes not from deposits or wire transfers, but from intra-bank credit memo transfers from another TD Bank account (account number xxxxxx6149) held by the related entity RM Enterprises International, Inc. ("RM Enterprises"), a defendant in this action. The account opening documents produced by the bank that I have reviewed show that Moskowitz opened and controls the RM Enterprises account. (See Exhibit K annexed). RM Enterprises is a Delaware corporation with its principal place of business in New York, New York. RM Enterprises is controlled by Moskowitz and Metter, who are officers and directors. (See Exhibit L annexed). RM Enterprises is not publicly held, and therefore has no reporting obligations with the Commission.

18. The cash flow chart above shows that deposits and credits surpassed the one million dollar mark in April 2009. The bank credit memo transfers show movement of funds from one account to another account held at that bank. The

6

credit and debit memos produced to the investigative staff that I have reviewed are internal hand-written banking memos or slips of paper reflecting an account holder's request to move or transfer funds to another related or connected or co-owned account. The credit and debit memos for Spongetech's account are pre-formatted memos filled out by hand by bank employees. The credit memos I reviewed show that the bank received requests from or on behalf of defendant Moskowitz to transfer cash funds to Spongetech's account from the Moskowitz-controlled RM Enterprises account. Such transfers account for $1.37 million of the $1.4 million of credits to the Spongetech account in April 2009. Those transfers also include three credit memo transfers totaling $159,400 from another separate TD Bank account (number xxxxxx3269) held by a related entity called Flo Weinberg, Inc. (hereinafter "Flo Weinberg"). The account opening documents produced by the bank for that account that I have reviewed show that Moskowitz opened and controls the Flo Weinberg account. Other check deposits to the Spongetech account in April 2009 included modest checks from Strauss Auto Parts and from the home shopping network QVC. (See Exhibit M annexed).

19. The cash flow chart shows that July 2009 was Spongetech's largest bank account credit month. Of the $9.174 million of deposits and credits that month, approximately $78,393 were rapid deposits of miscellaneous checks, including a corporate check from Ace Hardware for product purchases of $16,682.64, and over $9 million came by intra-bank credit memo, mostly from the RM Enterprises account, at the request of Moskowitz. None of the cash coming into Spongetech's

7

account in this month can be traced to its reported customer business with SA Trading, US Asia, Dubai, Fesco, and New Century. (See Exhibit N annexed).

20. In July 2009, just under $8.5 million dollars was debited from the Spongetech account. There is a $1 million debit memo that does not record a specific payee, a debit memo for $40,000 for a transfer to another TD Bank account held by a related entity named Vanity Events Holding, Inc. (hereinafter "Vanity Events")(which account opening documents produced by the bank show was opened and is controlled by Moskowitz), and a series of checks signed by Moskowitz and payable to: nine Major League Baseball franchises [Boston Red Sox ($78,125 x 2)(check no. 1254 and 1446); Atlanta Braves ($32,500)(check no. 1253); Texas Rangers ($23,000)(check no. 1275); Tampa Bay Rays ($42,500)(check no. 1293); St. Louis Cardinals ($41,667)(check no. 1294); Houston Astros ($26,000)(check no. 1304); Los Angeles Angels of Anaheim ($50,000)(check no. 1306); New York Mets ($100,000)(check no. 1331); and Florida Marlins ($13,125)(check no. 1354 and 1361)]; two New York City radio stations [WFAN ($120,025)(checks no.1328 and 1362) and CBS Radio ($24,313.38)(check no. 1361)]; and the NYC Triathalon ($15,000)(check no. 1407). In the prior month, June 2009, Moskowitz signed Spongetech checks payable to New York Yankees ($83,333.33)(check no. 1199); Baltimore Orioles ($15,000)(check no. 1210); Cleveland Indians ($21,250)(check no. 1320); New York Islanders ($36,000 x 2)(check no. 177 and 1205) and ($3,492.42)(check no.1308); Chicago Cubs ($42,500)(check no. 1257); St. Louis Cardinals ($41,667)(check no.1314), and CBS Radio ($30,859.29)(check no. 1232). (See

8

Exhibit N annexed). These sports sponsorship advertising expenditures increased Spongetech's public profile as the Spongetech name and logo appeared in various sports venues, visible to attending fans on-site, and to countless more around the world through satellite and internet television and radio broadcasts. I first became aware of the Spongetech name and logo watching televised sports broadcasts, well before I joined the team on this investigation.

21. The frequent and continuous transfers of money between RM Enterprises and Spongetech accounts, based on the banking records I have examined, started in November 2007 when the Spongetech account was first opened and established, and continued at least through the period covered by the staff's October 2009 subpoena. (See Exhibit O annexed). Less than 1% of the deposits and credits to Spongetech's corporate bank account can be traced directly to the sale and purchase of Spongetech products by verifiable corporate business customers.

<u>RM Enterprises's Corporate Banking Records<br>Show Continuous Credit Memo Transfers to Spongetech<br>of Proceeds of the Pump and Dump Scheme</u>

22. RM Enterprises is affiliated with Spongetech, is controlled by Metter and Moskowitz, and is Spongetech's majority shareholder. (See Exhibit L annexed).

23. RM Enterprises' corporate banking records produced by TD Bank pursuant to the staff's subpoena show that from January 2009 through October 2009, RM Enterprises transferred approximately $12,028,675 to Spongetech, by moving funds from its TD Bank account directly into Spongetech's TD Bank account through intra-bank debit memos. (See Exhibit J annexed).

24. Many of the intra-bank memos I reviewed contain handwritten notes indicating the transfer request came directly from Moskowitz. Based on my review of all credit and debit memos for the Spongetech and RM Enterprises accounts, it appears all of the funds transferred to Spongetech's account from RM Enterprises' account occurred at Moskowitz's direction or request. (See Exhibits M & N annexed).

25. The transfers of funds from RM Enterprises to Spongetech cannot be traced to the purchase of any Spongetech products by RM Enterprises. Moroever, I found no transactions, no credits, no deposits, no drafts, no checks, and no wire transfers into the RM Enterprises account from any of the claimed five foreign Spongetech customers.

26. As of October 13, 2009, based on transfer agent records I have reviewed, there were 2,999,984,950 authorized and outstanding shares of Spongetech. (See Exhibit P annexed). Spongetech's last quarterly report, for the quarter ending February 28, 2009, states that Spongetech had 722,866,061 shares of common stock issued and outstanding as of April 16, 2009. (See Exhibit G annexed). In fact, Spongetech had 1,621,866,461 shares of common stock issued and outstanding as of that date – a discrepancy of nearly 900 million shares. (See Exhibit Q annexed). In a February 2, 2009, press release, Metter announced that Spongetech had decreased its issued and outstanding shares "by approximately 29%," leaving 700,000,000 shares of Spongetech stock issued and outstanding. (See Exhibit R annexed). However, transfer agent records show that the actual number of outstanding shares was 1,240,355,602. (See Exhibit Q annexed).

27. Through RM Enterprises and other related entities who share a business address with RM Enterprises, Spongetech distributed approximately 2.5 billion of its shares into the public market in unregistered transactions. (See Exhibits S & T annexed). Spongetech distributed shares through RM Enterprises and other affiliates, who in turn distributed the shares to specific beneficiaries using attorney opinion letters to remove the restrictive legend from restricted shares that Spongetech transferred to RM Enterprises and other affiliates. Between June 24, 2009 and October 13, 2009, Spongetech distributed over 300 million shares to Asset Management, AIT Capital, and Wesley Equities. (See Exhibit P annexed). AIT Capital, Asset Management and Wesley Equities are wholly owned by RM Enterprises, their officers are Spongetech employees, and each entity maintains a corporate bank account at TD Bank. (See Exhibit U annexed). Between September 2007 and October 5, 2009, Spongetech distributed over 2.2 billion shares to RM Enterprises in 164 separate distributions. (See Exhibits P & S annexed).

28. Restricted shares of Spongetech, distributed to RM Enterprises and other affiliates, were further distributed without restrictive legends pursuant to attorney opinion letters, many from Joel Pensley ("Pensley") and Jack Halperin ("Halperin"). I have reviewed these letters.

### Pensley Opinion Letters

29. From March 15, 2007 to June 19, 2007, Pensley drafted at least four attorney opinion letters, dated on or about March 15, 2007; April 23, 2007; May 18, 2007; and June 19, 2007, each citing Commission Staff Legal Bulletin No. 4 as the basis

for removing restrictive legends from Spongetech stock. (See Exhibit V annexed). Pensley transmitted these four letters to Spongetech's transfer agent, Olde Monmouth. My review of transfer agent records indicates that the four Pensley letters resulted in the removal of the restrictive legend from 12,000,000 shares of Spongetech, and that the bulk of these shares were sold in the public market. (See Exhibit W annexed).

30. For example, on March 16, 2007, Moskowitz, as an officer of RM Enterprises, instructed Spongetech's transfer agent to remove the restrictive legend from Spongetech stock held by RM Enterprises and to transfer the unlegended shares to Mazuma Corp. (See Exhibit X annexed). Pensley provided an attorney opinion letter dated March 15, 2007, citing Commission Staff Legal Bulletin No. 4 as the basis for removing the restrictive legends. I have reviewed Mazuma Corp.'s brokerage records which show Mazuma Corp. sold those shares in transactions between April 12, 2007 and April 26, 2007, for a profit of $51,651.14. (See Exhibit Y annexed).

31. I have reviewed Pensley's opinion letters, in which he opined that RM Enterprises as the parent of Spongetech was: (1) "spinning-off" shares of Spongetech; (2) to RM Enterprises' shareholders; (3) for a valid business purpose; (4) on a *pro rata* basis to RM Enterprises' shareholders; and (5) the "spin-offs" were not for value. (See Exhibit V annexed). Pensley was a beneficiary of each his own opinion letters, and transfer agent records I have reviewed show he received 300,000 Spongetech shares. (See Exhibit W annexed).

32. I reviewed the transcript of Pensley's November 6, 2009 testimony to the staff, in which he admitted, among other things, that he authored the March 15, April 23, May 18 and June 19, 2007 attorney opinion letters and transmitted each to the transfer agent, that he conducted no due diligence beyond talking to Moskowitz, that he did not know whether the "spin-offs" were to "RM shareholders," that he did not know whether the "spin-offs" were pro-rata, and that he did not know the ratio of his own ownership of shares. (See Exhibit Z annexed). Pensley testified that he received at most approximately 200,000 Spongetech shares between 1999 and 2007, that he had not received any Spongetech shares after 2007, and that he had sold the remainder of his Spongetech stock "years ago," but transfer agent and brokerage records I have reviewed show that Pensley received over 2 million Spongetech shares between December 9, 2002, and April 22, 2008, and that Pensley sold Spongetech shares in the public market between April 30, 2007, and April 3, 2009. (See Exhibits Z & AA annexed).

Halperin's Opinion Letters

33. During the three month period from June 23, 2009 to August 21, 2009, RM Enterprises sold approximately 518 million shares using Rule 144 attorney opinion letters from Halperin. (See Exhibit T annexed). Rule 144 creates a safe harbor from the definition of "underwriter" contained in Section 2(a)(1) of the Securities Act of 1934. Moreover, Rule 144 contains a limit on the amount of securities sold in reliance on the rule, which in this instance, is one per cent of the shares outstanding as shown by the most recent report of the issuer. The shares sold pursuant to the Halperin opinion letters alone amount to approximately <u>71%</u>

of the 722,866,061 then outstanding shares as last published by Spongetech in its Form 10-Q filed on April 20, 2009, far more than the 1% trading volume permitted under Rule 144. (See Exhibit G annexed).

34. Halperin, acting as Spongetech's corporate counsel, wrote and issued 92 Rule 144 attorney opinion letters, opining in each letter that restrictive legends on Spongetech shares issued to RM Enterprises, Asset Management, AIT Capital, and Wesley Equities, and others, could be removed since each entity had held the securities for six months or longer. However, transfer agent records I have reviewed show that on several occasions, Moskowitz used Halperin's letters to remove restrictive legends from shares within days after Spongetech issued shares to RM Enterprises or other affiliates. For example, transfer agent records show with respect to Certificate No. 3864 for 34,000,000 shares issued to RM Enterprises on June 24, 2009, that Moskowitz used Halperin's letter and instructed the transfer agent to remove the restrictive legend from that certificate on that same day and transfer unrestricted share certificates to Diomede Corp. and Maremmano Corp. (See Exhibits BB & CC annexed). In his testimony to SEC staff, Halperin stated that he examined documents for approximately thirty-five purported loans that RM Enterprises made to Spongetech between December 31, 2007 and March 17, 2008, as well as the Company's public filings, and formed his opinion that the safe harbor under Rule 144 of the Securities Act applied because the holding period for the securities covered by his opinion letters could be measured from the date the loans were disbursed. (See Exhibit DD annexed).

        I have reviewed Spongetech's public filings which show that none of the purported thirty-five loans to RM Enterprises is reflected in those filings.

35. It is clear from the continuous flow of funds from RM Enterprises to Spongetech that the money path began with Spongetech's distribution of restricted Spongetech shares to RM Enterprises and other affiliates. RM Enterprises and other affiliates then distributed the Spongetech shares, using attorney opinion letters to remove the restrictive legends, to specific entities and individuals who then sold those shares into the public market. The beneficiaries of those distributions paid RM Enterprises, and RM Enterprises returned most of those funds to Spongetech's bank account. Moreover, the continuous transfer of funds from RM Enterprises to Spongetech appears from the records examined to be Spongetech's primary source of operating capital. This money cycle further indicates that Spongetech distributed restricted shares to RM Enterprises and affiliated entities with the intention that such shares be distributed into the public market.

36. For example, during July and August 2009, RM Enterprises received $8,207,750 from an entity named Acacia Investors LLC in twenty-six separate wire transfers. Brokerage records and transfer agent records I have reviewed show that Acacia was one of the largest beneficiaries of Spongetech's distribution of shares. Acacia received Spongetech shares through RM Enterprises, and its affiliates, AIT Capital, Asset Management and Wesley Equities. (See Exhibits S & T annexed).

37. During July and August 2009, Acacia received 90,000,000 shares of Spongetech stock from RM Enterprises and other affiliates. Brokerage records show that Acacia sold 60,000,000 shares into the public market in July for $6,613,248.97 and sold 30,000,000 in August for $3,375,000. (See Exhibit EE annexed). Shortly after its sales of Spongetech shares, Acacia deposited $4,832,250 by wire transfer directly into RM Enterprises' bank account in July 2009, and $3,375,000 in August 2009. RM Enterprises received wire transfers of proceeds from similar transactions involving other entities and individuals who sold Spongetech shares received in distributions from and through RM Enterprises. (See Exhibits FF & GG annexed).

38. RM Enterprises transferred over $9 million into Spongetech's bank account in July 2009 and over $4.4 million in August 2009. Those intra-bank credit memo transfers included funds Acacia returned to RM Enterprises from Acacia's public market sale of Spongetech shares that Acacia received from RM Enterprises and the three wholly-owned subsidiaries that share a business address with RM Enterprises. (See Exhibits FF & GG annexed). I have reviewed Spongtech's stock transfer agent records, which show that Acacia received its shares from RM Enterprises without a restrictive legend, as a directed beneficiary of attorney opinion letters. (See Exhibits S & T annexed).

39. Moskowitz, in letters on RM Enterprises letterhead, caused Spongetech's transfer agent to distribute 45,000,000 shares to Acacia as unrestricted shares during July and August 2009, relying on attorney opinion letters to remove the restrictive legend from shares held by RM Enterprises. (See, e.g., Exhibit HH annexed).

40. Transfer agent records I have reviewed show that AIT Capital, Asset Management, and Wesley Equities also caused Spongetech's transfer agent to distribute a total of 45,000,000 shares to Acacia during July and August 2009, using attorney opinion letters as the basis for removing the restrictive legend on Spongetech shares held by AIT Capital, Asset Management and Wesley Equities. (See, e.g., Exhibit II annexed). The banking records for RM Enterprises and Spongetech show that proceeds of the public sale of those shares were returned to RM Enterprises and then funneled back to Spongetech.

41. For example, on June 25, 2009, Spongetech issued 22,150,000 shares to Asset Management. (See Exhibit JJ annexed). Within one week, on June 29, 2009, using an attorney opinion letter from Halperin, those shares were re-issued by the transfer agent as unrestricted shares to Cobble Creek Consulting, Inc., an entity controlled by a Moskowitz associate. (See Exhibit KK annexed). Cobble Creek Consulting sold those shares for approximately $2,436,500 ($0.11 per share) and then wired a total of $1,772,000 ($0.08 per share) back to Asset Management in three wire transfers on July 13, 2009, July 15, 2009, and July 24, 2009. (See Exhibit LL annexed). Upon receipt of each wire, Asset Management immediately transferred the funds to RM Enterprises via intra-bank debit memo. (See Exhibit LL annexed).

42. For another example, on June 25, 2009, Spongetech issued 21,000,000 restricted shares to Wesley Equities. (See Exhibit MM annexed). Four days later, using an attorney opinion letter from Halperin, those shares were re-issued by the transfer agent as unrestricted shares to Clearview International Investments, an Israeli

nominee company that I learned, from a 2007 Department of Justice press release, was implicated in an international money laundering scheme. (See Exhibit NN & OO annexed). Clearview International Investments sold those shares for approximately $2,310,000 ($0.11 per share) and wired $1,679,985 ($.08 per share) from a Canadian bank account back to Wesley Equities. (See Exhibit PP annexed). Upon receipt of the wire, Wesley Equities immediately transferred $1,654,985 to RM Enterprises via intra-bank debit memo. (See Exhibit PP annexed).

43. For another example, on June 25, 2009, Spongetech issued 21,500,000 shares to AIT Capital. (See Exhibit QQ annexed). Within one week, on June 29, 2009, using an attorney opinion letters from Halperin, those shares were re-issued by the transfer agent as unrestricted shares to Double U Trading, an entity in the Virgin Islands. (See Exhibit RR annexed). Double U Trading sold those shares for approximately $2,365,000 ($0.11 per share) and then wired a total of $1,719,985 ($0.08 per share) back to AIT Capital on July 2, 2009. (See Exhibit SS annexed). The wire from Double U Trading originated from the same Canadian bank account as that of Clearview International Investments. (See Exhibit PP annexed). Upon receipt of the wire, AIT Capital immediately transferred $1,675,000 to RM Enterprises via intra-bank debit memo. (See Exhibit SS annexed).

Certain Other Wire Transfers

44. Moskowitz's wife, Mindy Moskowitz, received 34 wire transfers totaling $316,000 from the RM Enterprises bank account between January 2009 and

October 2009. (See Exhibit TT annexed). Those funds were wired to a JP Morgan Chase Bank account (account 987010281365) in her name.

45. Tiburon Capital Group, which is controlled by Metter, a defendant in this action, received 9 wire transfers totaling $326,000 from the RM Enterprises account between January 2009 and October 2009. (See Exhibit UU annexed).

46. D.L. Investments, controlled by Metter's wife, Deborah Metter, received 3 wire transfers totaling $21,500 from the RM Enterprises bank account between January 2009 and October 2009. (See Exhibit VV annexed).

47. A full and complete accounting is essential to begin to determine, if possible, what amount of revenue or income received by Spongetech and/or RM Enterprises and/or transferred between Spongetech and RM Enterprises traces to the sale of Spongetech shares as distinct from Spongetech products, at any and all times during and throughout the period from the commencement of the corporate entity known as Spongetech, to the present.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Charles C. Davis, Jr.

Executed on May 13, 2010
Washington, D.C.