**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
SECURITIES AND EXCHANGE                    :
COMMISSION,                                          :
                                                              :
                                  Plaintiff,          :                **OPINION AND ORDER**
                                                              :                10-CV-2031 (DLI) (JMA)
                        -against-                        :
                                                              :
SPONGETECH DELIVERY SYSTEMS, INC., :
RM ENTERPRISES INTERNATIONAL, INC., :
STEVEN Y. MOSKOWITZ, MICHAEL E.      :
METTER, GEORGE SPERANZA, JOEL         :
PENSLEY, and JACK HALPERIN,             :
                                                              :
                                  Defendants.       :
-------------------------------------------------------- x
**DORA L. IRIZARRY, United States District Judge:**

The Securities and Exchange Commission ("SEC") initiated the instant enforcement

action on May 5, 2010 against defendants Spongetech Delivery Systems, Inc. ("Spongetech"),

RM Enterprises International, Inc. ("RM Enterprises"), Steven Y. Moskowitz, Michael E.

Metter, George Speranza, Joel Pensley, and Jack Halperin, alleging violations of several

securities laws and rules, including Sections 5 and 17(a) of the Securities Act of 1933, 15 U.S.C.

§ 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5,

17 C.F.R. § 240.10b-5.[1]  The SEC alleges that defendants "pumped" the value of Spongetech's

_____

[1]Around the time the SEC filed the complaint in this action, Metter and Moskowitz were named
as defendants in a related criminal complaint filed in the Eastern District of New York, and an
indictment was filed against them on August 6, 2010.  *See United States v. Metter*, Docket No.
10-cr-600 (DLI).  George Speranza, as well as several other individuals who were not named in
the SEC action, were subsequently added as defendants by way of a superseding indictment filed
on October 14, 2010.  Additionally, in October 2009, two class actions were filed against
Spongetech, Metter, Moskowitz, RM Enterprises, Halperin, Pensely and several other
individuals in the Southern District of New York, which were subsequently transferred to this
court on September 8, 2010.  *See Orlan v. Spongtech Delivery Systems, Inc*., Docket No. 10-cv-
4093 (DLI), *Le et al v. Spongetech Delivery Systems, Inc*., Docket No. 10-cv-4101 (DLI).

1

shares and "dumped" the shares into the public market in unregistered transactions. Presently

before the court is the SEC's Motion for preliminary injunctive relief. For the reasons set forth

below, the SEC's motion is granted in part, stayed in part, and denied in part without prejudice.

## BACKGROUND

A. **THE PARTIES**

Spongetech is a publicly-traded company that sells soap-filled sponges. On July 9, 2010,

while the parties were briefing the current motion, Spongetech petitioned for bankruptcy. On

July 19, 2010, the Bankruptcy Court directed the appointment of a trustee over Spongetech, and

on July 20, 2010, the trustee was approved.

RM Enterprises is the majority shareholder of Spongetech. Metter was Spongetech's

President and Chief Executive Officer ("CEO"), but he resigned as CEO subsequent to the filing

of the instant motion. (Spongetech Memorandum in Opposition, Docket Entry 39 ("Spongetech

Opp."), at 4.) Metter also served as President of RM Enterprises until his resignation in

September 2007.[2] (Metter Memorandum in Opposition, Docket Entry 40, "Metter Opp."), at 3.)

Moskowitz is Spongetech's Chief Operating Officer ("COO"), Chief Financial Officer ("CFO"),

Chief Accounting Officer ("CAO"), and Secretary, and he served as a member of Spongetech's

Board of Directors.[3] Moskowitz also served as an officer and director of RM Enterprises,

although his current status is unclear. Speranza is a self-employed consultant associated with

Spongetech.

---

[2] Metter also served as a director of RM Enterprises. Although he contends that he resigned this position in 2007, (*see* Metter Opp. 3), he testified before the SEC in 2009 that he was still a shareholder and director, (*see* Declaration of Charles C. Davis, dated June 25, 2010, Docket Entry 54, ("Davis Decl. II"), Ex. A).

[3] Spongetech informed the court that Moskowitz intended to resign, but there has been no evidence of or representation to the court regarding Moskowitz's actual resignation. (SEC Reply Brief as to Spongetech and Metter ("SEC Metter Reply"), Docket Entry 62, at 4.)

Pensley and Halperin are attorneys licensed to practice in the state of New York. Pensley has a history of securities violations. In 1998, Pensley was enjoined from future violations of the general antifraud and registration provisions of the federal securities laws and suspended pursuant to Rule 102(e) of the SEC's Rules of Practice.

**B.      SEC ALLEGATIONS AND FACTUAL BACKGROUND**

      1.      **Spongetech, Metter and Moskowitz Issue False Statements in Press Releases and Public Filings**

To create the appearance of prosperity, Spongetech, Metter, and Moskowitz allegedly made materially false or misleading statements in press releases and public SEC filings with respect to Spongetech's reduction in the number of its outstanding shares, business with five customers, and Spongetech's revenue. Moskowitz and Metter reviewed and authorized the press releases and signed and certified the public filings before they were issued. (*See* Declaration of Christine E. Neal, dated May 13, 2010 ("Neal Decl.") ¶ 8 & Ex. B.)

In a February 2, 2009 press release, Metter announced that Spongetech had decreased its issued and outstanding shares "by approximately 29%," leaving 700,000,000 shares issued and outstanding. (Declaration of Charles C. Davis, dated May 13, 2010 ("Davis Decl. I") ¶ 26 & Ex. R.) However, the actual number of shares as of that date was 1,240,355,602. (*Id.* ¶ 26 & Ex. Q.) Similarly, Spongetech's quarterly report for the quarter ended February 28, 2009 states that Spongetech had 722,866,061 shares of common stock issued and outstanding as of April 16, 2009. (*Id.* ¶ 26 & Ex. G.) However, the actual number of shares as of that date was 1,621,866,461. (*Id.* ¶ 26 & Ex. Q.)

Between April 2007 and May 2010, Spongetech issued several press releases, often quoting Metter or Moskowitz, describing business with five customers that do not exist. On April 30, 2007, Spongetech issued a press release claiming that it had "signed a Letter of Intent

(LOI) to sell 1,500,000 Car Wash and Car Wax sponges to exporter, SA Trading Group Corp. . . . an exporter of automotive products to South America." (*Id.* ¶ 7 & Ex. C.) The press release quoted Moskowitz as stating that they were finalizing their agreement with SA Trading Group Corp. (*Id.*) In 2008, Spongetech issued press releases claiming product sales to three large foreign customers: SA Trading, US Asia Distribution ("US Asia"), and Dubai Export Import Company ("Dubai"). (*Id.* ¶ 8 & Ex. D.) On September 1, 2009, Spongetech issued a press release, which described the financial success of the company and quoted both Metter and Moskowitz describing the success of the company and the large amount of orders the company had received. (*Id.* ¶ 10 & Ex. F.)

In Spongetech's 10-Q for the period ended February 28, 2009, Spongetech reported revenue in excess of $30 million and stated that 99.4% of its sales were attributable to six customers: SA Trading, Dubai, US Asia, Fesco Sales Corp., New Century Media and Walgreens. (Neal Decl. ¶ 8 & Ex. B.) Several other filings contained similar misrepresentations about customers and revenue. In Spongetech's Form 10-KSB for the fiscal year ended May 31, 2008, Spongetech represented that 70.5% of its reported shares for the period were derived from orders received from customers identified as SA Trading, US Asia and Dubai. (*Id.* ¶ 5 & Ex. B.) In Spongetech's Form 10-Q, filed with the SEC on October 15, 2008, Spongetech represented that, for the three-month period that ended August 31, 2008, 67.7% of its reported sales were derived from SA Trading, US Asia and Dubai. (*Id.* ¶ 6 & Ex. B.) In Spongetech's Form 10-Q, filed with the SEC on January 14, 2009, Spongetech represented that, for the period that ended November 30, 2008, 82.9% of its reported sales were derived from SA Trading, Dubai and New Century Media. (*Id.* ¶ 7 & Ex. B.)

Many of the statements in the press releases and public filings were allegedly false. The SEC was unable to contact five of the customers or verify any information provided by Spongetech regarding the companies' existences, and consequently determined that SA Trading, Dubai, US Asia, Fesco Sales Corp., and New Century Media do not exist, and only Walgreens is an existing company. (*See* SEC Memorandum in Support of Preliminary Injunction, Docket Entry 2 ("SEC Mem."), at 5-7; *see also* Neal Decl. ¶¶ 4-53.) Moreover, Spongetech's bank records demonstrate that it never received payments for the alleged business with these customers. (SEC Mem. 5-6; Davis Decl. I ¶ 14.) Spongetech identified a single corporate bank account in response to an SEC subpoena, the records for which demonstrate that transfers from RM Enterprises, and not customer orders, were the source of the majority of the funds flowing into Spongetech. (Davis Dec. I ¶¶ 14-21.)

2. **Speranza Creates False Websites**

In September 2009, in response to public and SEC inquiries about Spongetech's customers, Speranza created websites and virtual office space for the fictitious customers. (Neal Decl. ¶¶ 26-34, 39-43, 47 & Exs. U, SS.) Speranza maintained the websites and forwarded all emails sent to the websites to his own email account. (*Id.* ¶ 47.) Speranza testified before the SEC that he made up the names of the contact people for the alleged customers that were listed on the websites. (*Id.* Ex. SS, Speranza Testimony, at 102-04.) On September 10, 2009, Speranza registered the domain names of each website with a private registration service that prevents access to the personal identifying information of the registrant. (*Id.* ¶ 42, Ex. GG.) Speranza also arranged for physical space for the fictitious customers. (*Id.* ¶ 47 & Ex. SS, Speranza Testimony, at 94, 102-04.)

3. **Spongetech, Metter and Moskowitz Distributed Restricted Shares through RM Enterprises**

After inflating the value of its shares, Spongetech distributed the shares in unregistered transactions to RM Enterprises and other affiliated entities that acted as conduits to further distribute the shares. (Davis Decl. I ¶¶ 27, 35.) Spongetech claimed an exemption and safe harbor under Section 4(2) of the Securities Act and Rule 506 of Regulation D. Both require the issuer to exercise reasonable care to assure that the securities are purchased for investment and not with a view to public distribution. The SEC contends that the shares were issued for the purpose of publicly distributing them.

4. **Halperin and Pensley Rendered Baseless Opinion Letters**

Between July 2007 and May 2009, numerous opinion letters written on Pensley letterhead were sent to Spongetech's transfer agent. (SEC Reply Brief as to Pensley, Docket Entry 106 ("Pensley Reply"), at 2 n.2.) The SEC contends that, although 216 of the letters allegedly were forged, at least four of the letters can be attributed to Pensley. (*Id.*; SEC Mem. 10.) The SEC argues that the four letters do not have the font and formatting inconsistencies that appear in many of the allegedly forged letters. (SEC Pensley Reply 2 n.2.) The transfer agent used these four opinion letters to remove restrictive legends from approximately twelve million restricted shares. (SEC Mem. 10.) RM Enterprises then distributed the shares in unregistered transactions. In each of the four opinion letters, Pensley contended that all of the requirements of Staff Legal Bulletin No. 4 were met, including that RM Enterprises, as the parent of Spongetech, was "spinning-off" shares of Spongetech to RM Enterprises' shareholders, and that RM Enterprises was not doing so for value. (Davis Decl. I ¶ 31 & Ex. V.) The SEC argues that these requirements were not in fact met.

Between June 2009 and September 2009, Halperin issued ninety-two opinion letters, which were sent to Spongetech's new transfer agent, who improperly removed restrictive legends from over 922 million Spongetech shares held by RM Enterprises so that the shares could be publicly distributed. In the opinion letters, Halperin relied on Rule 144 and stated that the restrictive legends on Spongetech shares issued to RM Enterprises could be removed because RM Enterprises had held the securities for six months or longer. However, on several occasions, Moskowitz used Halperin's letters to remove the restrictive legends from shares only a few days after Spongetech issued the shares to RM Enterprise or other affiliates.

## APPLICABLE LAW

### A.    Preliminary Injunction Standards

#### 1.    Restraint Against Future Securities Law Violations

To obtain a preliminary injunction enjoining future violations of securities laws, the SEC must make a "clear showing" of both (1) the likelihood of success by establishing a prima facie case of a past violation of the securities laws, and (2) a "reasonable likelihood" of future violations absent the injunction. *SEC v. Unifund SAL*, 910 F.2d 1028, 1037 (2d Cir. 1990); *see also SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (requiring "a substantial showing"). There is no requirement that the SEC demonstrate irreparable injury or lack of any adequate remedy at law. *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).

"Although the Court may enter an injunction upon a proper showing of a violation of securities laws, 'there is no per se rule requiring the issuance of an injunction upon the showing of a past violation.'" *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402 (S.D.N.Y. 2001) (quoting *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977)). To determine whether an injunction should be granted, courts consider such factors as: (1) the degree of scienter exhibited;

(2) whether the violation was an isolated incident; (3) the sincerity of the defendant's assurances against future violations; (4) the defendant's recognition of the wrongful nature of his conduct; and (5) whether, by reason of his professional occupation, defendant might be in a position that may provide the opportunity for future violations. *SEC v. Suman,* 684 F.Supp.2d 378, 391-92 (S.D.N.Y.2010); *SEC v. Prater*, 296 F. Supp. 2d 210, 216 (D. Conn. 2003); *see also SEC v. Universal Major Indus.*, 546 F.2d 1044, 1048 (2d Cir. 1976).

The court also must consider the nature of the preliminary relief the SEC is seeking. The SEC should make a "more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks." *SEC v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990); *see also SEC v. Manor Nursing Centers, Inc*., 458 F.2d 1082, 1102 (2d Cir. 1972) ("the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion"). "In some cases a preliminary injunction can have very serious consequences, yet in other cases may be fairly described as only a mild prophylactic." *Unifund*, 910 F.2d at 1039 (internal quotation marks and citations omitted).

More rigorous scrutiny of the SEC's evidence in support of restraining future action is warranted where a legal professional is alleged to have violated the securities laws, because "[t]he allegation of such a violation . . . is serious enough to eviscerate an honest lawyer's career if endorsed by a court based upon mere suspicion and innuendo." *Gonzalez de Castilla*, 145 F. Supp. 2d at 415. In *SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998), the court noted: "The reputational and economic harm of suffering a preliminary injunction, especially on charges of fraud, is . . . severe for individuals who make their living in the securities industry . . . . These individuals stand to lose considerable business and respect in their communities if even a

preliminary injunction is entered." 1 F. Supp. 2d at 360; *see also Gonzalez de Castilla*, 145 F. Supp. 2d at 415.

2. **Asset Freeze**

A freeze of assets is an ancillary remedy that merely "assures that any funds that become due can be collected." *SEC v. Unifund SAL*, 910 F.2d 1028, 1037 (2d Cir. 1990). To obtain an asset freeze, the SEC must demonstrate prima facie evidence that a violation of the securities laws has occurred, but it does not need to show a likelihood of future violations. *See id.* Courts can also consider whether the "asset freeze is needed in order to prevent [the defendant] from secreting or dissipating his assets." *SEC v. Margolin*, 1992 WL 279735, at *6 (S.D.N.Y. Sept. 30, 1992); *see also SEC v. Montle*, 65 Fed. Appx. 749 (2d Cir. 2003); *Gonzalez de Castilla*, 145 F. Supp. 2d at 420. "A freeze is particularly warranted where the defendant's alleged conduct involves fraud." *SEC v. Credit Bancorp Ltd.*, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010) (citing *Manor Nursing Ctrs.*, 458 F.2d at 1106).

The SEC's burden of proof rises in relation to the hardship the asset freeze would create for the defendants. *See Unifund SAL*, 910 F.2d at 1037. The court must weigh the importance of ensuring that assets will be available to compensate investors or provide disgorgement against the possibility that the freeze will cause such a disruption of defendants' legitimate business affairs that the assets would be destroyed and the investors would be placed in greater danger of losing their funds. *See Manor Nursing*, 458 F.2d at 1106.

3. **Accounting and Preservation Of Documents**

"[T]he SEC may seek [relief] other than injunctive relief to effectuate the purposes of the federal securities laws." *Manor Nursing*, 458 F.2d at 1104 (citing *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971)); *see also SEC v. Lybrand*, 2000 WL 913894, at *12

(S.D.N.Y. July 6, 2000). For example, an accounting is appropriate where it is necessary to determine the amount of profits reaped from the allegedly illicit sales, the present location of such proceeds, or the defendants' ability to repay. *See Lybrand*, 2000 WL 913894, at *12; *SEC v. Margolin*, 1992 WL 279735, at *7 (S.D.N.Y. Sept. 30, 1992). "Such relief is minimally intrusive." *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997). Moreover, an order barring the alteration or destruction of documents is also appropriate where there is a need to preserve the status quo until a final resolution of the merits. *See Unifund*, 910 F.2d at 1040 n.11.

**B.     Standards for Demonstrating Securities Violations**

> **1.     Sections 10(b) and 17(a) of the Exchange Act**

To state a violation of section 10(b) or Rule 10b-5, the SEC must allege that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). "Essentially the same elements are required under Section 17(a)(l)-(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." *Id.*

Violative statements are not limited to those made in issuing documents, and defendants have been held liable for misrepresentations in press releases and other corporate documents. *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 963 (2d Cir. 1993) (citing *Fischman v. Raytheon*, 188 F.2d 783 (2d Cir. 1951)). A fact is material if "there is a substantial likelihood that a reasonable investor would consider it important in deciding [whether to purchase a security]." *Cavanagh*, 1998 WL 186847, at *39 (citations omitted). Scienter has been defined as a the "intent to deceive, manipulate or defraud, . . . or at least knowing misconduct." *SEC v.*

*First Jersey Securities, Inc*., 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted). The "in connection with" requirement is construed broadly and flexibly, and is satisfied when the misrepresentation or omission would be the sort on which a reasonable investor would rely when purchasing or selling securities. *In re Carter-Wallace, Inc. Sec. Litig*., 150 F.3d 153, 156 (2d Cir. 1998).

To establish an aiding and abetting securities violation, the SEC must show a securities law violation by a primary party, scienter on the part of the aider and abettor, and "substantial assistance" by the aider and abettor in the achievement of the primary violation. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 206 (2d Cir. 1989); *see also SEC v. U.S. Environmental, Inc*., 155 F.3d 107, 113 (2d Cir. 1998) (noting that the SEC now has authority to assert aiding and abetting claims under Section 10(b)).

2.     **Section 5 of the Securities Act**

To establish a violation of Securities Act Section 5, the SEC must show that (1) no registration statement was filed or in effect at the time of the sale; (2) the defendant, directly or indirectly, sold or offered to sell the securities; and (3) interstate means were used in connection with the offer or sale. *See SEC v. Universal Exp., Inc*., 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007); *SEC v. Lybrand*, 2000 WL 913894, at *10 (S.D.N.Y. July 6, 2000). Liability under Section 5 "extends beyond those who sell stock to all necessary participants in a sale of unregistered stock." *SEC v. Cavanaugh*, 1 F. Supp. 2d 337, 372 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d. Cir. 1998).

3.     **Section 13 of the Exchange Act**

Section 13(a) states that issuers of securities must file "such information and documents as the Commission shall require." 15 U.S.C. § 78m(a)(1). Under Rules 13a-1 and 13a-13,

issuers consequently must file quarterly and annual reports. 17 C.F.R. §§ 240.13a-1, 13a-13.

Section 13(b)(2)(A) requires that issuers who are subject to the reporting provisions of the

Exchange Act "make and keep books, records, and accounts, which . . . accurately and fairly

reflect the[ir] transactions and dispositions of the[ir] assets." 15 U.S.C. § 78m(b)(2)(A). Section

13(b)(2)(B) requires that issuers who are subject to the reporting provisions of the Exchange Act

"devise and maintain a system of internal accounting controls sufficient to provide reasonable

assurances that" transactions are appropriately executed and assets are adequately protected. 15

U.S.C. § 78m(b)(2)(B). Section 13(b)(5) states that "No person shall knowingly circumvent or

knowingly fail to implement a system of internal accounting controls or knowingly falsify any

book, record, or account described in paragraph (2)." An aiding-and-abetting claim must allege

a primary violation, actual knowledge of the violation, and substantial assistance in the violation.

*SEC v. Espuelas*, 698 F. Supp. 2d 415, 434 (S.D.N.Y. 2010).

## DISCUSSION

### A.   SPONGETECH

In light of the SEC's withdrawal of some of its requests as to Spongetech,[4] the court

construes the SEC's motion as to Spongetech as currently seeking a court order: (1) enjoining

Spongetech from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Sections

10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), 15(d), and various Exchange Act Rules; (2) enjoining

Spongetech from altering or destroying documents, and (3) compelling Spongetech to "provide

an accounting of money and shares of Spongetech stock it received and the disposition of such

---

[4] The SEC initially included a request for an asset freeze and the appointment of a receiver as to
Spongetech. In light of the bankruptcy filing and the appointment of a trustee in the bankruptcy
proceeding, the SEC withdrew its request for a receiver and an asset freeze as to Spongetech.
(SEC Letter, dated July 20, 2010, Docket Entry 93.) The SEC states, however, that it continues
to maintain its motion "as to all other relief it seeks." (*Id.*)

monies and stock." (Notice of Mot. at 2, 4.) Spongetech has consented to an injunction against future violations of the securities laws. (Spongetech Opp. 4.) Spongetech provides no argument in opposition to an order compelling an accounting of money or prohibiting the destruction of documents.

There appears to be no dispute that the SEC has made a substantial showing of the likelihood of Spongetech's violation of the securities laws. To prove liability against a corporation, "a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Spongetech, Metter, and Moskowitz repeatedly made materially false or misleading statements in press releases and SEC public filings. As discussed more fully below with regard to Metter and Moskowitz, the SEC has shown that Metter and Moskowitz acted with scienter because they knew the statements were false. The scienter of Moskowitz, as Spongetech's Chief Operating Officer, Chief Financial Officer, Chief Accounting Officer, and Metter, as Spongetech's President and Chief Executive Officer, can be imputed to Spongetech. *See, e.g.*, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001); *In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010).

Therefore, the SEC's request for an order prohibiting Spongetech from committing future violations of the securities laws is granted.[5] Furthermore, as described in the SEC's proposed

---

[5] In its opposition, Spongetech requests a hearing prior to the issuance of a preliminary injunction. (Spongetech Opp. 7.) "Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute." *Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir.1997). In light of the SEC's withdrawal of its request for an asset freeze, Spongetech has no remaining basis for a hearing, as Spongetech does not oppose the remainder of the SEC's requests. *See SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997) (quoting *SEC v. Frank*,

order, Spongetech is enjoined from altering or destroying documents and must provide an accounting to the SEC. (Proposed Order, Docket Entry 2, at 11-12).

## B.    <u>METTER</u>

With respect to defendant Metter, the SEC seeks an order: (1) enjoining Metter from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Sections 10(b) and 13(b)(5), and Exchange Act Rules 10b-5, 13b2-1, 13b2-2, and 15d-14, and Section 304 of the Sarbanes Oxley Act of 2002, and from aiding and abetting violations of various statutory and regulatory provisions; (2) requiring Metter to provide an accounting of monies and shares of Spongetech stock that he received and the disposition of such money and stock; (3) prohibiting Metter from altering or destroying documents; (4) prohibiting Metter from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) and Exchange Act Section 21(d); and (5) preliminarily freezing Metter's assets. (Notice of Mot. 4-5.) Metter consents to the entry of an injunction against future violations of the securities laws and agrees to place in escrow all shares of Spongetech stock that he holds pending the outcome of the litigation. (*Id.*) However, Metter argues that an asset freeze is inappropriate because there is no evidence that Metter will dissipate his assets and the SEC has "essentially all of the protection to which it is arguably entitled." (Metter Opp. 5-6.) Metter does not address the SEC's other requests.

In his opposition to the asset freeze, Metter baldly asserts that he was not involved in Spongetech's daily operations. He fails to provide any further argument or explanation as to why he believes the SEC has not established a prima facie case. The court finds that the SEC has met its burden. The SEC has shown that Metter made materially false or misleading statements in

---

388 F.2d 486 (2d Cir. 1968)) (no hearing where there is no dispute as to the facts and no "purpose would be served by a hearing").

multiple press releases and SEC public filings to inflate the value of Spongetech shares. Metter signed many of the allegedly fraudulent filings in his capacity as Chief Executive Officer, and also made statements that were directly quoted within the filings. Metter knew or should have known that the filings contained false and misleading statements. For example, Metter testified under oath before members of the SEC staff that he had met one of the contact persons for the fictitious customers. (Neal Decl. Ex. SS, Metter Testimony, at 255, 272-73; *id.* Ex. SS, Speranza Testimony, at 102-04.) Metter's statements in the press releases and public filings speak to the viability of Spongetech, suggesting a value for its operations and market potential that were, on this record, unquestionably deceptive. Accordingly, the statements are material. There is also no dispute that the statements related to the purchase and sale of securities. In sum, the SEC has established a prima facie case that Metter violated Section 10(b) and Section 17(a).

Although the SEC has provided only a vague description of Metter's participation in the distribution of unregistered shares, there is nevertheless prima facie evidence that Metter violated Section 5. The SEC has shown that (1) no effective registration statement exists in connection with the shares sold through RM Enterprises; (2) RM Enterprises issued unregistered stock; and (3) the relevant stock certificates were either mailed or sent by courier as well as facsimile. There is also evidence that Metter was a necessary participant and substantial factor in the unregistered offerings. When Halperin wrote the opinion letters that caused the shares to be freely tradable, he relied on the written representations of Moskowitz and Metter to conclude that the shares did not need to be registered, when in fact, Metter's and Moskowitz's representations were false. (Halperin Memorandum in Opposition, Docket Entry 32 ("Halperin Opp."), at 7-8; Halperin Decl. ¶¶ 10-12.) Therefore, it was, in part, as a result of Metter's misrepresentations that some of the shares were distributed.

The SEC has also shown that Metter is likely to dispose of his assets absent an asset freeze. Not only did Metter's conduct involve fraud, it involved a scheme to funnel and conceal illegal proceeds through nominees and affiliates. (*See* SEC Reply Brief as to Metter, Docket Entry 62 ("SEC Metter Reply"), at 5-7.) Metter's past conduct is sufficient to demonstrate that, without an asset freeze, Metter would likely dispose of his assets. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) ("Because of the fraudulent nature of the appellants' violations, the court could not be assured that appellants would not waste their assets prior to refunding public investors' money."); *SEC v. Credit Bancorp Ltd.*, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010).

Metter argues that his assets are not traceable to the fraud and thus not subject to a freeze. The only case Metter cites in support of his assertion is *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997), which held that "the Commission is not entitled to freeze assets unrelated to its investigation." However, the *Bremont* Court ordered the SEC "to file with the Court within 60 days an estimate of defendants' maximum liability, including all penalties and interest, whereupon the Court will entertain an application to modify the amount frozen." *Id.* It appears that the court was not requiring that the SEC show that the funds were traceable to the fraud, but rather that the funds would likely be subject to eventual disgorgement. *See id.* This requirement is consistent with the Second Circuit's statement that the purpose of the freeze is to enable the SEC "to preserve its opportunity to collect funds that may yet be ordered disgorged." *Unifund*, 910 F.2d at 1041. It is clear that, ultimately, a defendant can be ordered to disgorge funds that were not causally tied to the fraudulent activity. *SEC v. Aragon Capital Mgmt., LLC*, 672 F. Supp. 2d 421, 443 (S.D.N.Y. 2009); *SEC v. Banner Fund Intern.*, 211 F.3d 602, 617 (D.C. Cir.

2000).[6]  Furthermore, "the terms and duration of the freeze order fall within this Court's 'broad equitable powers to grant ancillary relief.'"  *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) (citing *SEC v. Am. Bd. of Trade, Inc*., 830 F.2d 431, 438 (2d Cir. 1987)).

Although the SEC need not demonstrate that the frozen assets are traceable to the fraud, it must show that the amount is an approximation of defendant's maximum liability. The SEC demonstrates in its reply brief that "Metter was the beneficiary of at least $5,386,000," which is the "bare minimum reasonable approximation of Metter's illegal profits."  (SEC Metter Reply 5-9.)  The court finds that Metter's offer to put "six million shares of Spongetech stock that he personally owns, which he received in lieu of compensation for his employment at Spongetech" to be insufficient because there is no evidence that their value meets Metter's maximum liability. Therefore, $5,386,000 of Metter's assets shall be frozen, and the SEC may renew its application after it obtains any additional information, including an accounting, that further informs its calculation.

Having found that the SEC is entitled to preliminary injunctive relief as to future violations and an asset freeze, an accounting is appropriate to determine the amount of profits Metter reaped from the fraudulent acts, the present location of such proceeds, and his ability to repay.  Additionally, Metter does not oppose an order prohibiting him from altering or destroying documents or engaging in any offering of penny stock.  In light of the findings as to Metter, the

---

[6]  "[T]he requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act. Rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge." *Banner Fund*, 211 F.3d at 617 "To hold . . . that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results. . . . [F]or example, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement." *Id.*

court therefore holds that, as described in the SEC's proposed order, Metter is enjoined from altering or destroying documents or engaging in any offering of penny stock, and must provide an accounting to the SEC. (Proposed Order, Docket Entry 2, at 11-12).[7]

## C. **MOSKOWITZ**

With respect to Moskowitz, the SEC seeks an order: (1) enjoining Moskowitz from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Sections 10(b) and 13(b)(5), and Exchange Act Rules 10b-5, 13b2-1, 13b2-2, and 15d-14, and Section 304 of the Sarbanes Oxley Act of 2002, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act and Exchange Act Rules 12b-20, 13a-13, 15d-1, 15d-11, and 15d-13; (2) requiring Moskowitz to provide an accounting of monies and shares of Spongetech stock that he received and the disposition of such monies and stock; (3) prohibiting Moskowitz from altering or destroying documents; (4) prohibiting Moskowitz from engaging in any offering of penny stock; and (5) preliminarily freezing Moskowitz's assets. Moskowitz has not filed an opposition to the SEC's motion. (Notice of Mot. 3-4.)

For substantially the same reasons set forth above regarding Metter, the SEC has made a substantial showing that Moskowitz likely violated the anti-fraud provisions of the securities laws. For example, Moskowitz made false statements in public documents and signed the filings in his capacity as Chief Financial Officer and Chief Operating Officer. Moskowitz knew or should have known that the filings contained false and misleading statements because he testified

---

[7] In his opposition, Metter requests a hearing prior to the issuance of a preliminary injunction. (Metter Opp. 7.) Metter does not dispute any of the relevant facts that justify the imposition of a preliminary injunction and the facts he seeks to prove do not alter the court's conclusion. For example, Metter argues that a hearing would show that his funds are not derived from the fraud. Because the court finds that tracing is not necessary, this issue is irrelevant. Even if there are factual disputes as to other issues, the SEC would still be entitled to relief. Therefore, a hearing is unnecessary. *See Bremont*, 954 F. Supp. at 731.

under oath before members of the SEC staff that he spoke to several contact persons for the fictitious customers. (Neal Decl. ¶ 48 & Ex. SS, Moskowitz Testimony, at 403-15.)

As with Metter, the SEC also has demonstrated a strong likelihood that Moskowitz violated Securities Act Section 5 because he obtained the opinion letters and misrepresented the relevant facts in order to facilitate the distributions. For example, Pensley stated to the SEC that Moskowitz hired him to write the opinion letters, and Halperin argues that he relied on the representations of Moskowitz in determining that exemptions to the registration requirement were applicable. (Declaration of Charles C. Davis, dated July 10, 2010 ("Davis Decl. IV"), Ex. C, at 85; Halperin Opp. 7-8.)

Furthermore, the SEC has demonstrated a substantial likelihood that Moskowitz violated the various subsections of Exchange Act Section 13 and the Exchange Act Rules listed above because Spongetech failed to file all of the required period reports with the SEC and included materially false information in the reports filed. (*See* SEC Mem. 20; Compl. ¶ 52.) Additionally, Spongetech produced purchase orders in response to an SEC inquiry, which contained materially false information. (Neal Decl. ¶¶ 50-53 & Ex. P.) Although the SEC has provided only minimal information regarding these allegations, in light of the evidence as to the other violations, the SEC has shown sufficiently that it is likely that Moskowitz knowingly provided substantial assistance to Spongetech in the commission of these violations.[8]

---

[8] However, the SEC has not made an argument regarding or otherwise supported their request for a preliminary injunction based on Moskowitz's alleged violations of Section 304 of the Sarbanes Oxley Act of 2002. Therefore, an injunction against future violations of this statute will not issue. Obviously, all persons must follow the law, and the absence of an injunction regarding the Sarbanes Oxley Act should not be construed as an endorsement of its violation.

The SEC has also shown a reasonable likelihood of future violations absent the injunction. Moskowitz's conduct involved a high degree of scienter, as demonstrated by the substantial efforts taken to hide the fraudulent scheme. *See SEC v. Lipkin*, 2006 WL 435035, at *1 (E.D.N.Y. Jan 9, 2006). Moreover, the incidents were not isolated. Moskowitz and Metter repeatedly issued false and misleading press releases over a period of a few years. *See, e.g.*, *SEC v. Lipkin*, 2006 WL 435035, at *1 (E.D.N.Y. Jan 9, 2006) ("The occurrences were not isolated, but rather took place continuously over a two-month period."); *SEC v. Freeman*, 290 F. Supp. 2d 401, 406 (S.D.N.Y. 2003) (conduct "occurred in a continuous and systematic pattern"). Moskowitz has not provided any assurances against future violations and has not recognized the wrongful nature of his conduct. Therefore, an injunction against future violations is warranted.

Moreover, a freeze of Moskowitz's assets is also warranted because the SEC has demonstrated a prima facie case that Moskowitz violated the securities laws and that, given the nature of the wrongdoing, it is likely that Moskowitz will attempt to dispose of his assets. However, freezing all of Moskowitz's assets is not appropriate. In light of the circumstances of this action, a freeze on Moskowitz's assets in an amount equal to an approximation of his maximum liability will give the SEC "substantial security without unduly burdening the [defendant]." *Unifund SAL*, 910 F.2d at 1042. Therefore, the SEC must submit within twenty (20) days of this Order an approximation of Moskowitz's maximum liability, including penalties and interest.

Having found that the SEC is entitled to preliminary injunctive relief as to future violations and an asset freeze, the additional remedies sought by the SEC are appropriate. Therefore, as described in the SEC's proposed order, Moskowitz is enjoined from altering or

destroying documents or engaging in any offering of penny stock, and must provide an accounting to the SEC. (Proposed Order, Docket Entry 2, at 11-12).

## D.    RM ENTERPRISES

With respect to RM Enterprises, the SEC seeks an order: (1) enjoining RM Enterprises from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5; (2) requiring RM Enterprises to provide an accounting of monies and shares of Spongetech stock that it received and the disposition of such monies and stock; (3) prohibiting RM Enterprises from altering or destroying documents; and (4) preliminarily freezing the assets of defendants RM Enterprises. RM Enterprises has not filed any opposition to the entry of a preliminary injunction.

As discussed above, the factors of a Section 5 violation have been established, and RM Enterprises was directly distributing the shares. Accordingly, the SEC has made a substantial showing that RM Enterprises likely violated Section 5.

Although the SEC fails to set forth any argument as to RM Enterprises' violations of Section 17(a) or Section 10(b), and instead describes only how Metter, Moskowitz, and Spongetech made false statements, (SEC Mem. 5-8, 17-19; Compl. ¶¶ 26-52), there is sufficient evidence to show that RM Enterprises is liable for violations of these provisions. As stated above, where an agent of a corporation committed a culpable act with the requisite scienter, the act and accompanying mental state are attributable to the corporation. *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 729 (S.D.N.Y. 2003). Furthermore, "a principal is chargeable with the acts and knowledge of an agent as long as the agent in some respect served the principal or, stated differently, unless the agent 'totally abandoned' the principal's interests

and 'acted entirely for his own or another's purpose.'" *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453 (S.D.N.Y. 2010) (quoting *In re Mediators, Inc.*, 105 F.3d 822, 826 (2d Cir. 1997)).

Here, the SEC has shown that Moskowitz knowingly violated Section 17(a) and Section 10(b), and that he was an officer and director of RM Enterprises who controlled RM Enterprises during the relevant period. Although the SEC did not state directly that Moskowitz was acting on behalf of both Spongetech and RM Enterprises when issuing the false statements, the evidence demonstrates that Moskowitz's conduct benefitted RM Enterprises. RM Enterprises was the majority shareholder of Spongetech, and, thus, benefitted from statements made to inflate the value of Spongetech stock. Moskowitz also used RM Enterprises to distribute the shares and generate profits. Thus, RM Enterprises was able to share in the illegally gained profits. Therefore, Moskowitz's knowledge and acts are attributable to RM Enterprises and the evidence is sufficient to show that RM Enterprises likely violated the antifraud provisions of the securities laws. *Cf. CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 823-26 (S.D.N.Y. 2006) (where individual agent acted on behalf of the corporation, the knowledge and acts could be imputed to corporate defendant); *Ballesteros Franco*, 253 F. Supp. 2d at 729 (where individual who committed securities fraud controlled corporate defendants, the acts and knowledge of the individual could be imputed to the corporation).

The SEC also has shown a reasonable likelihood of future violations absent the injunction. "[W]here, as here, a party has failed to appear, that party fails to recognize his wrongdoing and provide assurances against further violations." *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, 2009 WL 3233110, at *5 (E.D.N.Y. Oct. 2, 2009) (citation and internal quotation marks omitted). Therefore, an injunction against future violations of Section 5 is warranted.

By providing prima facie evidence of a securities violation, the SEC additionally has met its burden of demonstrating that an asset freeze is warranted. A freeze on RM Enterprises' assets will give the SEC "substantial security without unduly burdening the [defendant]." *Unifund SAL*, 910 F.2d at 1042. Therefore, the SEC must submit within twenty (20) days of this Order an approximation of RM Enterprises' maximum liability, including penalties and interest. Having found that the SEC is entitled to preliminary injunctive relief as to future violations and an asset freeze, the additional remedies sought by the SEC are appropriate. Therefore, as described in the SEC's proposed order, RM Enterprises is enjoined from altering or destroying documents and must provide an accounting to the SEC. (Proposed Order, Docket Entry 2, at 11-12).

## E.    **SPERANZA**

With respect to Speranza, the SEC seeks an order providing for the following: (1) enjoining Speranza from violating Exchange Act Section 10(b), and Exchange Act Rule 10b-5, and from aiding and abetting violations of Exchange Act Section 10(b), and Exchange Act Rule 10b-5; (2) requiring Speranza to provide an accounting of monies and shares of Spongetech stock that he received and the disposition of such money and stock; (3) prohibiting Speranza from altering or destroying documents; and (4) prohibiting Speranza from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) and Exchange Act Section 21(d). Speranza has not appeared in this action.

The SEC has made a substantial showing that Speranza likely violated Section 10(b) and Rule 10b-5. Speranza materially misrepresented the existence of Spongetech's fictitious customers by creating websites, setting up virtual offices, renting temporary office space for the customers, and inventing business persons. The statements were material because they concealed the fraud and gave Spongetech an appearance of legitimacy. Speranza admitted in his

testimony before the SEC that he created the customers, thus demonstrating that he acted knowingly. Finally, the statements were in connection with a securities transaction.[9]

The SEC additionally has shown a reasonable likelihood of future violations absent the injunction. As noted above, where a party has failed to appear, that party fails to recognize his wrongdoing and provide assurances against further violations. Therefore, an injunction against future violations of Section 10(b) and Rule 10b-5 is warranted.

Having found that the SEC is entitled to preliminary injunctive relief as to future violations, the additional remedies sought by the SEC are appropriate. Therefore, as described in the SEC's proposed order, Speranza is enjoined from altering or destroying documents or engaging in any offering of penny stock, and must provide an accounting to the SEC. (Proposed Order, Docket Entry 2, at 11-12).

## F. **HALPERIN**

With respect to Halperin, the SEC seeks an order: (1) enjoining Halperin from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5; (2) requiring Halperin to provide an accounting of monies and shares of Spongetech stock that he received and the disposition of such money and stock; (3) prohibiting Halperin from altering or destroying documents; (4) prohibiting Halperin from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) and Exchange Act Section 21(d); and (5) prohibiting Halperin from "providing professional services to any person or entity in connection

---

[9] However, the SEC has not provided any evidence or explanation in support of its contention that Speranza provided substantial assistance to others in their violations of Section 10(b) or Rule 10b-5 and thus aided and abetted the violations. Therefore, the injunction will not prohibit aiding and abetting violations of Section 10(b) or Rule 10b-5. However, as noted above, the absence of an injunction against these provisions should not be interpreted as an endorsement of their violation.

with the offer or sale o[f] securities, including but not limited to, participating in the preparation or issuance of any attorney opinion letter related to such offerings." (Notice of Mot. 4-5.) Halperin has agreed to provide an accounting and refrain from altering or destroying any documents. (Halperin Opp. 5.) However, Halperin contends that the SEC's other requests are excessive and unwarranted.

Although Halperin concedes that he wrote erroneous opinion letters, he maintains that he did not act with the requisite scienter. Halperin argues that he had no reason to know of Metter's and Moskowitz's fraudulent activity and further contends that he did not have the motive or opportunity to commit the fraud. (Halperin Opp. 18-22.) However, in the Second Circuit, scienter may also be established "'through a showing of reckless disregard for the truth.'" *SEC v. Milan Capital Group, Inc*., 2000 WL 1682761, at *5 (S.D.N.Y. Nov. 9, 2000) (quoting *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998)); *SEC. v. Aragon Capital Mgmt., LLC*, 672 F. Supp. 2d 421, 434-35 (S.D.N.Y. 2009); *see also Breard v. Sachnoff & Weaver, Ltd*., 941 F.2d 142, 144 (2d Cir. 1991) ("For Rule 10(b)(5) purposes, scienter includes recklessness."). Here, the SEC does not claim that Halperin had motive and opportunity or that he knowingly participated with Metter and Moskowitz in issuing false statements in public filings. Rather, the SEC alleges that Halperin recklessly issued false statements in his opinion letters. (SEC Reply Brief as to Halperin, Docket Entry 54 ("Halperin Reply"), at 7-8.)

"To qualify as reckless conduct, defendants' conduct must have been 'highly unreasonable' and 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 76 (2d Cir. 2001) (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc*., 570 F.2d 38, 47 (2d Cir. 1978)). In their brief, the

SEC has not set forth the standard of ordinary care applicable to an attorney issuing opinion letters, and the standard appears to be unclear.

At most, the SEC has shown that Halperin relied on documentation that did not support several of his assertions in the opinion letters. Nevertheless, even if the SEC has provided sufficient evidence as to the remaining factors of a violation of the antifraud provisions, to obtain the preliminary injunction, the SEC must also show that there is a risk that Halperin will repeat the violations. Furthermore, as noted above, more rigorous scrutiny is required because Halperin makes his living as a legal professional engaging in work involving securities, and the "reputational and economic harm of suffering a preliminary injunction, especially on charges of fraud," would be severe. *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1998). Individuals like Halperin "stand to lose considerable business and respect in their communities if even a preliminary injunction is entered." *Cavanagh*, 1 F. Supp. at 360; *see also Gonzalez de Castilla*, 145 F. Supp. 2d at 415. "The allegation of such a violation . . . is serious enough to eviscerate an honest lawyer's career if endorsed by a court." *Gonzalez de Castilla*, 145 F. Supp. 2d at 415. The SEC has not addressed these grave concerns, relying instead solely on the evidence regarding Halperin's recklessness.

A preliminary injunction against Halperin is not warranted here. The SEC has not demonstrated the requisite high degree of scienter, and it appears that Halperin did not instigate this fraud and only minimally participated in the overall scheme. Indeed, the SEC has not alleged that Halperin was aware of or involved in the misstatements made in the public filings, which is the much larger fraud alleged against Spongetech, Metter and Moskowitz. Rather, the SEC alleges only that Halperin made false statements in the opinion letters. (*See* SEC Halperin

Reply 8-9.)  Notably, there also is no evidence of any prior violation of these statutes or other misconduct.[10]

In addition, not having been implicated in the larger fraud alleged against Metter and Moskowitz, Halperin has represented, as an officer of the court, that he will not violate the fraud provisions in the future and will check supporting documentation more carefully.  (Halperin Decl. ¶ 12.)  The consequences of this litigation likely have deterred him from engaging in similar activity again.  *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 383-84 (S.D.N.Y. 1998) ("[T]he Court believes [defendant's] assertions that he will not violate the fraud provisions of the securities' statutes in the future, not because he has shown remorse, but because the consequences of this litigation have effectively deterred him.").

In sum, the court finds that the public interest will be served best if Halperin is allowed to continue in his profession without the stigma of a preliminary injunction under the fraud statutes.  "Although a preliminary injunction is a useful device where a court finds that it is necessary to deter future violations, there are cases where an injunction may do more harm than good."  *Cavanaugh*, 1 F. Supp. 2d at 384.  As the Second Circuit has stated: "The prohibition against future securities law violations is among the sanctions that we have characterized as having grave consequences."  *SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990).  While the SEC may yet establish at trial that a permanent injunction against Halperin is appropriate, the court finds that, based on the present record and the equitable considerations at issue, a preliminary injunction against Halperin enjoining future violations of the antifraud provisions would not be

_____

[10] The SEC notes that, on June 22, 2010, it issued a temporary trading suspension against Green Energy Resources, based on concerns relating to inaccurate statements in press releases.  (Davis Decl. II ¶ 16.)  Until recently, Halperin was Green Energy Resource's attorney and Secretary.  (*Id.* ¶ 15.)  Without additional evidence, the event does not speak to Halperin's conduct, and the court will not draw inferences from the trading suspension without a basis for doing so.

in the public interest, and, therefore, it will not be entered. Similarly, an injunction against Halperin enjoining him from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) and Exchange Act Section 21(d), and prohibiting him from providing professional services to any person or entity in connection with the offer or sale of securities, are also unwarranted at this time.

In sum, in light of Halperin's consent, as described in the SEC's proposed order, Halperin is enjoined from altering or destroying documents and must provide an accounting to the SEC. (Proposed Order, Docket Entry 2, at 11-12).

## G.   **PENSLEY**

With respect to Pensley, the SEC seeks an order: (1) enjoining Pensley from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5; (2) requiring Pensley to provide an accounting of monies and shares of Spongetech stock that he received and the disposition of such money and stock; (3) prohibiting Pensely from altering or destroying documents; (4) prohibiting Pensley from engaging in any offering of penny stock; and (5) prohibiting Pensley from "providing professional services to any person or entity in connection with the offer or sale o[f] securities, including but not limited to, participating in the preparation or issuance of any attorney opinion letter related to such offerings." (Notice of Mot. 4-5.) The SEC's basis for the request is that Pensely allegedly wrote four opinion letters, dated March 15, 2007, April 23, 2007, May 18, 2007, and June 19, 2007, which contained false or misleading statements. (Davis Dec. ¶ 29 & Exs. V, W.)

Pensley makes several arguments as to why he has not violated any securities laws, none of which have merit. First, Pensley claims that he did not author any of the four opinion letters. (Pensley Memorandum in Opposition, Docket Entry 90, ("Pensley Opp."), at 5-6.) He contends

that he had prepared a draft opinion for Moskowitz, who used the draft to create a final version. (*Id.* at 9.) Pensley further contends that Moskowitz sent the opinions back to Pensley as attachments to emails, but that Pensley never downloaded or examined them. (*Id.*) As evidence that he did not write the opinion letters, Pensley claims that he "always sent opinions either directly to the agent or to a requesting broker," and here, "all of the opinions were sent with electronic signatures from Moskowitz to the Agent, a procedure never used by Pensley." (*Id.*; Pensley Decl. ¶¶ 28-30.)

Pensley's contentions are belied by the fact that he emailed the June 19, 2007 opinion letter directly to the transfer agent, copying Moskowitz, and stating within the email, "Gentlemen: Opinion for Spongetech spin-off." (Davis Decl. IV Ex. G.) Therefore, according to Pensley's own description of his process for sending opinion letters, this letter was likely written by Pensley.

Moreover, Pensley's contentions are directly contradicted by his own previous statements. For example, Pensley testified before the SEC on November 6, 2009 that he prepared opinion letters, and he described his considerations when writing them. (Davis Decl. IV Ex. C at 50-52, 85.) He also testified that Moskowitz, on behalf of Spongetech, retained him to write the opinion letters. (*Id.*) Pensley further testified that he wrote one of the opinions because he "discovered" Staff Legal Bulletin No. 4, and determined it was appropriate in Spongetech's circumstances. (*Id.* at 87-88.) Pensley also testified that, as a result of the March 15, 2007 letter, he received 250,000 shares of restricted stock, and he described his ethical considerations when writing that opinion letter. (*Id.* at 218-19.)

Pensley argues that these statements, given under oath before a governmental administrative agency, were incorrect and that he "made numerous misstatements [to the SEC],

giving unsupported conclusions and suppositions as statements of fact as to what he had done in 2007." (Pensley Opp. 8-9.)  However, not only did the statements reveal Pensley's deliberative process, thus making it unlikely that he was mistaken, Pensley made similar admissions in other circumstances.  In a May 15, 2009 letter to the SEC, Pensley stated that he authored an opinion letter for Spongetech in "early 2007" and that it was the last opinion letter he wrote.  (Davis Decl. IV Ex. D.)  Pensley also wrote an email to the transfer agent on the same date, and stated that "the last legal opinion which I actually wrote was dated March 15, 2007." (Davis Decl. IV Ex. E.)[11]  The transfer agent stated, in a May 14, 2009 letter to the SEC, that Pensley had stated that Pensley had not written an opinion since late 2007 or early 2008.  (Davis Decl. IV Ex. O.)  On January 6, 2010, Pensley reiterated, in a Wells Submission to the SEC, that he prepared both the March 15, 2007 and the April 23, 2007 opinion letters.  (Davis Decl. IV Ex. B.)  Based on the evidence of Pensley's prior statements in letters and in his testimony before the SEC, although it is not clear that Pensley wrote the May 18, 2007 letter, it is proper to attribute the March 15, 2007, April 23, 2007 and June 19, 2007 letters to Pensley.

Second, Pensley claims that the opinion letters were proper under Rule 144(k) of the Securities Act.

> Rule 144 generally affects only "restricted securities," or those securities that have never been publicly sold. To comply with Rule 144, a person ordinarily must meet numerous requirements concerning public information, holding periods, number of shares, manner of sales, and notice to the Commission. However, under subsection (k) of the Rule, if a person is not now and has not been an affiliate of the issuer within the last three months, and at least two years have elapsed since the securities to be sold were last acquired from an issuer or affiliate of the issuer, then that person need not comply with the other Rule 144 requirements. An "affiliate" is in turn defined as "a person that directly, or

---

[11] He further stated that "any subsequent opinion received by you with my signature was forged." (Davis Decl. IV Ex. E.)  Although Pensley contends that the letters after a certain date were not written by him, he also admits that at least some of the letters were written by him.

indirectly . . . controls, or is controlled by, or is under common control with [the] issuer."

*SEC v. Kern*, 425 F.3d 143, 148 (2d Cir. 2005).  With regard to the calculation of the holding period, 144(d)(3)(v) provides that the "[s]ecurities acquired from the affiliate of the issuer by gift shall be deemed to have been acquired by the donee when they were acquired by the donor." Pensley contends that 144(k) properly applies because RM Enterprises held the shares for over two years before the transfer, and the recipient of the shares were non-affiliate donees because they did not pay anything for the shares distributed to them from RM Enterprises.  (Fidler Decl. ¶ 5; Pensley Opp. 14.)

The SEC contends that RM Enterprises and as well as several of the transferees were Spongetech affiliates, and, therefore, the rule does not apply.  (SEC Pensley Reply 8-9.)  The SEC further maintains that shares were given to Pensley for work that he had done, and thus they were given for consideration.  (*Id.*)

Pensley should have known that at least one of the transferees was an affiliate.  Pensley prepared public filings for Spongetech that stated, "Michael Metter . . . has been president of RM Enterprises, Inc., [Spongetech's] majority shareholder, a company which also is the sole shareholder of Flo Weinberg . . . ."  (Davis Decl. IV Exs. M, N; SEC Pensley Reply 9.) Therefore, although Pensley claims that he did not know that the transferees were affiliates, (Pensley Opp. 15), he should have known that at least Flo Weinberg, which received shares as a result of the March 15, 2007 letter, (*see* Davis Decl. IV Ex. B), was an affiliate.

Additionally, Pensley should have known that the shares were given for consideration. Pensley received shares of stock around the time that he prepared the March 15, 2007 opinion letter.  (Davis Decl. IV Ex. C. at 176.)  Furthermore, on March 12, 2007, three days before Pensley issued the March 2007 opinion letter, the Spongetech Board of Directors adopted a

resolution, wherein Pensely agreed to accept 400,000 shares of stock in exchange for advisory services and expenses. (*Id.*) Pensley testified that he was not sure whether he received the shares as compensation for the opinion letters. (*Id.* at 181.) Although it is not clear that the stock Pensley received was part of the shares distributed as a result of the March 15, 2007 opinion letter, Pensley's inability to recollect the circumstances of his receipt of the shares, in conjunction with the other evidence, demonstrates that Pensley did not have a sufficient basis to issue the opinion letter and was reckless in doing so.

Third, Pensley claims that that the opinion letters were proper under Section 4(1) 1/2. However, "an affiliate claiming a 4(1) 1/2 exemption has the burden of establishing that such sales do not constitute a disguised public distribution." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 368-69 (S.D.N.Y. 1998). The affiliate must demonstrate "that it took adequate precautions to ensure that such a resale would not occur," such as "placing a legend on the securities alerting the buyer to the restricted character of the securities" or issuing a "stop-transfer order" to the transfer agent for the securities, "which would prevent the buyer from reselling without obtaining an opinion by counsel for the issuer as to the legality of the resale." *Id.* Here, Pensley wrote the opinion letters for the express purpose of removing the restrictive legends and, thus, cannot show that adequate precautions were taken.

Fourth, Pensley argues that he did not have knowledge of Moscowitz's and Metter's intent. However, that fact is irrelevant. As demonstrated above, Pensley was reckless in not ascertaining that the opinion letters contained false and misleading representations. *See SEC v. Milan Capital Group, Inc.*, 2000 WL 1682761, at *5 (S.D.N.Y. Nov. 9, 2000) (scienter may be established through a showing of reckless disregard for the truth). Pensley's recklessness is further demonstrated by the fact that he did not review any documentation to verify the predicate

facts for the opinion letters, (Davis Decl. IV Ex. C at 103, 202-03, 209, 220-21, 223), stopped writing Spongetech opinion letters because he wasn't familiar with "the going on of the company," and did not "want to have the obligation of doing the extensive due diligence, which is necessary for any opinion . . . ." (Davis Decl. IV Ex. C at 51-52.) Pensley further admitted that he had not conducted any due diligence before rendering his opinion, other than talking to Moskowitz. (Davis Decl. I Ex. Z at 219-23.)[12]

In sum, the SEC has made a substantial showing that Pensley likely violated Sections 10(b) and 17(a) by making material misrepresentations or omissions in the opinion letters with scienter in connection with the purchase or sale of securities. Moreover, the SEC has made a substantial showing that Pensley violated Section 5 because Spongetech, through RM Enterprises, issued unregistered stock for unrestricted sale and Pensley was a necessary participant and substantial factor in making the unregistered offerings.

The SEC also has demonstrated a reasonable likelihood of future violations by Pensley. Pensley has not made any assurances against future violations and has not recognized the wrongful nature of his conduct. Indeed, Pensley denies any wrongdoing, despite admitting to the SEC that he authored some opinion letters. Pensley clearly has made misrepresentations to this court, and such behavior is utterly unacceptable. Not only may Pensley have the opportunity for future violations by virtue of his professional occupation, but his history of previous violations

---

[12] Pensley also claims that he is a victim of the fraud and a whistleblower, arguing that numerous opinion letters with his letter head were falsified and that he provided the SEC with notice of the fraud. However, the fact that Pensley sent a letter to the SEC concerning misconduct by others does not diminish his own wrongdoing. Moreover, the fact that some of the letters allegedly signed by Pensley were falsified does not diminish the fact that at least three of the letters are properly attributed to him.

provides additional support for the imposition of an injunction.[13]  *See, e.g.*, *SEC v. Cavanagh*, 155 F.3d 129, 135-36 (2d Cir. 1998).

Wherefore, Pensley is enjoined from future violations of Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5.  Moreover, some of the additional remedies sought by the SEC are appropriate.  As described in the SEC's proposed order, Pensley is enjoined from altering or destroying documents or engaging in any offering of penny stock, and must provide an accounting to the SEC.  (Proposed Order, Docket Entry 2, at 11-12).  However, the SEC's request for an injunction prohibiting Pensley from providing professional services to any person or entity in connection with the offer or sale of securities is denied.  Based on the present record and the equitable considerations, such a drastic remedy is not yet warranted.

## CONCLUSION/PRELIMINARY INJUNCTION ORDER

For the foregoing reasons, the SEC's request for a preliminary injunction is granted in part, denied in part without prejudice, and stayed in part.  Accordingly, it is hereby ORDERED that:

A.  Spongetech

(1)  is enjoined from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Sections 10(b), 13(a), (b)(2)(B), (b)(2)(B), 15(d), and Exchange Act Rules 10b-5, 12b-20, 13a-13, 15d-1, 15d-11, 15d-13;

---

[13] In 1999, Pensley and the SEC entered into a Consent Order, whereby Pensley was enjoined from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.  (Pensley Decl. Ex. A.)  Pensley contends that he was automatically granted readmission to practice after three years, thus demonstrating that the injunction was minor.  Regardless of the timing of readmission, the prior misconduct is an additional factor considered by the court.

(2)     is enjoined and restrained from destroying, altering, concealing or otherwise interfering with the access of the SEC to any and all documents, books, and records, that are in the possession, custody, or control of Spongetech, its officers, agents, employees, servants, accountants, financial or brokerage institutions, or attorneys-in-fact, that refer, reflect, or relate to the allegations in the complaint, including, without limitation, documents, books, and records referring, reflecting or relating to its finances or business operations, or the offer, purchase, or sale of Spongetech securities and the use of the proceeds therefrom;

(3)     must file with the court and serve upon the SEC, within ten (10) business days from the date of this Order, a verified written accounting, signed under penalty of perjury, of:

    (a).     all assets, liabilities and property currently held, directly or indirectly, by or for the benefit of Spongetech, including, without limitation, bank accounts, brokerage accounts, investments, business interests, loans, lines of credit, and real and personal property wherever situated, describing each asset and liability, its current location and amount;

    (b).     all money, property, assets and income received by Spongetech, or for its direct or indirect benefit, at any time from January 1, 2007, through the date of such accounting, describing the source, amount, disposition and current location of each of the items listed;

    (c).     the names and last known addresses of all bailees, debtors, and other persons and entities that currently are holding the assets, funds or property of Spongetech; and

(d).    all assets, funds, securities, and real or personal property received by Spongetech, or any other person controlled by Spongetech, from persons who provided money to Spongetech in connection with the offer, purchase, or sale of Spongetech securities, from January 1, 2007, to the date of the accounting, and the disposition of such assets, funds, securities, real or personal property.

B.    Metter:

(1)    is enjoined from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Sections 10(b) and 13(b)(5), and Exchange Act Rules 10b-5, 13b2-1, 13b2-2, and 15d-14, and Section 304 of the Sarbanes Oxley Act of 2002, and from aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) and Exchange Act Rules 12b-20, 13a-13, 15d-1, 15d-11, and 15d-13;

(2)    is enjoined from affecting documents in his possession, custody, or control, in the manner described above in Section A(2);

(3)    must provide an accounting in the manner described above in Section A(3);

(4)    is enjoined from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) and Exchange Act Section 21(d); and

(5)    shall have $5,385,000 of his assets frozen. The SEC may renew its application for an asset freeze after it obtains additional information, including an accounting, that further informs its calculation.

C.    Moskowitz

(1)    is enjoined from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Sections 10(b) and 13(b)(5), and Exchange Act Rules 10b-5, 13b2-1, 13b2-2,

and 15d-14, and from aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 15(d) and Exchange Act Rules 12b-20, 13a-13, 15d-1, 15d-11, and 15d-13;

(2)     is enjoined from affecting documents in his possession, custody, or control, in the manner described above in Section A(2);

(3)     must provide an accounting in the manner described above in Section A(3);

(4)     is enjoined from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) and Exchange Act Section 21(d); and

(5)     shall have his assets preliminarily frozen.  However, the asset freeze shall be stayed.  Within twenty (20) days of the date of this Order, the SEC shall provide an estimate of Moskowitz's maximum liability.

D.     RM Enterprises

(1)     is enjoined from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5;

(2)     is enjoined from affecting documents in its possession, custody, or control, in the manner described above in Section A(2);

(3)     must provide an accounting in the manner described above in Section A(3); and

(4)     shall have its assets preliminarily frozen.  However, the asset freeze shall be stayed.  Within twenty (20) days of the date of this Order, the SEC shall provide an estimate of RM Enterprises' maximum liability.

E.     Speranza

(1)     is enjoined from violating Exchange Act Section 10(b) and Exchange Act Rule 10b-5;

(2)     is enjoined from affecting documents in his possession, custody, or control, in the manner described above in Section A(2);

(3)     must provide an accounting in the manner described above in Section A(3); and

(4)     is enjoined from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) and Exchange Act Section 21(d).

F.     Halperin

(1)     is enjoined from affecting documents in his possession, custody, or control, in the manner described above in Section A(2); and

(2)     must provide an accounting in the manner described above in Section A(3).

G.     Pensley

(1)     is enjoined from violating Securities Act Sections 5(a), 5(c), and 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5;

(2)     is enjoined from affecting documents in his possession, custody, or control, in the manner described above in Section A(2);

(3)     must provide an accounting in the manner described above in Section A(3); and

(4)     is enjoined from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) and Exchange Act Section 21(d).

The remainder of the SEC's motion is denied without prejudice.

SO ORDERED.

Dated: Brooklyn, New York
       March 14, 2011

                                        /s/
                        _____
                              DORA L. IRIZARRY
                          United States District Judge